In re **HOLCOMB HEALTH CARE SERVICES, LLC, Debtor.**

**Holcomb Health Care Services, LLC, Plaintiff,**

v.

**Quart Limited, LLC, et al., Defendants.**

**Bankruptcy No. 01–04329.**
**Adversary Nos. 03–0203A, 04–0386A.**

United States Bankruptcy Court,
M.D. Tennessee.

Dec. 15, 2004.

Order Entering Judgment,
December 30, 2004.

B.R. 253, 256 (Bankr.D.Minn.1984); *In Re Fill*, 84 B.R. 332, 339 (Bankr.S.D.N.Y.1988)).

L. Andy Paredes, Susan Hardie Jacks, Mehaffy Weber, Houston, TX, William L. Norton, Boult Cummings Conners Berry PLC, Nashville, TN, David G. Rogers, David G. Rogers, Brentwood, TN, for Holcomb Healthcare Services, LLC as Special Counsel.

Joseph E. Gasperetti, Joseph E. Gasperetti, PC, New York, NY, for Defendants.

Barbara D. Holmes, Harwell, Howard, Hyne, Gabbert & Manner, Elaine P. Coker, Judicial Assistant to Hon. George C. Paine, II, U.S. Bankruptcy Court, Nashville, TN, for the Official Committee of Unsecured Creditors.

## MEMORANDUM

GEORGE C. PAINE, II, Chief Judge.

### I. Introduction

Following a week-long trial commencing Monday October 25, 2004 and concluding Friday, October 29, 2004, the court took these consolidated adversary proceedings under advisement. The court allowed, at the request of the parties, four weeks for submission of post-trial briefs and proposed findings of fact and conclusions of law. This Memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

### II. Case History

"It has become appallingly obvious that our technology has exceeded our humanity." Albert Einstein (1879–1955).

Dr. Robert Ray Holcomb is a highly educated, and talented, creative inventor. He has a B.S. in and Masters Degree in Microbiology from the University of Alabama. He also holds a PhD. in Pharmacology and an M.D. from Vanderbilt University. He completed a residency in Pediatrics at the University of Florida, a residency in Neurology at Vanderbilt, and a fellowship in Child Neurology at Vanderbilt. Dr. Holcomb is currently on an extended sabbatical from the Vanderbilt Department of Neurology where he regularly attends in child neurology, sees patients in the clinic and in the emergency room, and handles "call" rotations. Dr. Holcomb is also doing research and development for an entity called Holcomb Scientific Creations, LLC.

Dr. Holcomb's relationship with Vanderbilt University is long-standing. When he returned to Nashville in the late 1980's, he began conducting joint research in the laboratory of Dr. Michael McLean at Vanderbilt. In 1988 and 1989, while Dr. Holcomb was in his second residency, he researched the effects of a particular magnetic field array on biological systems and continued working on what would become the Mag-

naBloc™ technology.[1] During this time, Dr. Holcomb formed Holcomb Medical Research Institute ("HMRI"), a 501(c)(3) not-for-profit entity, to attempt to raise money for research on magnetics and metals, primarily neuromagnetics and pain research.

In 1990, Dr. Holcomb created Holcomb Medical Corporation with several other investors to assist in the development, marketing, and distribution of the MagnaBloc™ technology. Dr. Holcomb hoped to begin using the devices in pain clinics for Nashville-based Centennial Hospital. Near that same time, Holcomb Technology, Inc. was also created to distribute rights and ownership that were in the Holcomb Medical Corporation which then owned certain rights to technology. Holcomb Medical Corporation kept the pain clinics, and Holcomb Technology, Inc. took the fledgling technology.

Holcomb Technology Inc. then entered into a formal research agreement with HMRI and Vanderbilt for applied research on the various embodiments of Holcomb's inventions. Prior to the formation of Holcomb Healthcare Services LLC in 1995, Holcomb held various interrelated entities, summarized as accurately as the proof allows in the following chart:

| Date Created | Name of Entity | Business of Entity |
| --- | --- | --- |
| 1989 | Holcomb Medical Research Institute | 501(c)(3) non-profit entity to raise money for magnetics research |
| 1991 | Holcomb Medical Corporation | To assist in the development, marketing, and distribution of the MagnaBloc ™ technology, and hopefully begin using the devices in pain clinics for Nashville-based Centennial Hospital |
| 1991 | Holcomb Technology, Inc. | Distribute rights and ownership held in the Holcomb Medical Corporation which then owned certain rights to technology. Holcomb Technology is no longer an active company. The debtor bought the MagnaBloc ™ from Holcomb Technology, Inc. for ownership plus a $700,000 note. |
| 1992 | Novatech, Inc. | General Partner of Novatech, LP |
| 1992 | Novatech, LP | In the business of food flavor and fragrance |
| 1993 | Holcomb Management, Inc. | A general partner of Holcomb Investment Company and an active company that files tax returns and derives some revenue from Holcomb Scientific Creations LLC. |
| 1993 | Water Resources Technology, Inc. | Unknown |
| 1994 | Holcomb Investments, LP | A management company set up to hold Holcomb family assets |

In September of 1995, Dr. Holcomb and an investor from Memphis, John C. Townsend, decided to form a new entity known as Holcomb Healthcare Services LLC.[2] Substantially contemporaneous with the creation of HHCS, the parties entered into

---

1. MagnaBloc™ technology in the most basic terms is magnets in a quadrapolar magnetic array whereby their polarity creates a steep field gradient. The technology is based on what occurs when things pass through the steep field gradient.

2. The company was originally named Commodore Health Services LLC, and was renamed Holcomb Healthcare Services LLC.

the following agreements: (1) a purchase transaction with Holcomb Technology, Inc. for HHCS to acquire the MagnaBloc™ and other related technology; (2) the creation of an Amended and Restated Operating Agreement for HHCS; (3) an Employment Agreement hiring Dr. Holcomb as Chief Scientific Officer; (4) an Assignment of a wide variety of Dr. Holcomb's technology to HHCS; and (5) a License and Non–Disclosure Agreement whereby HHCS granted HMRI a narrow license to allow HMRI to renew its magnetic research with Vanderbilt.[3] Also at this time, Dr. Holcomb and Mr. Townsend, as Trustee for the Townsend Scientific Trust ("TST"), entered into an agreement whereby the TST agreed to contribute to the Holcomb Medical Trust ("HMT") certain property including a 64.82% ownership interest in HHCS, stock in Holcomb Technology, Inc., and stock in Alatech, Inc. The TST's property contributions were subject to forfeiture for nonpayment of approximately $1,400,000.00 Dr. Holcomb owed to Mr. Townsend from past business dealings.[4]

In the Asset Purchase Agreement signed in December 1995, Holcomb Technology, Inc. sold to HHCS for a purchase price of $700,000.00 the MagnaBloc Technology, Patent Number 5,312,321 (the "Patent") for the MagnaBloc device, and all contract rights related thereto, including without limitation, all confidentiality and nondisclosure agreements and the like, and any payments due Seller relating to the Technology (collectively, the "Assets"). At this same time, HHCS issued equity ownership to Alatech, Inc. for manufactur-

ing rights in order to perfect HHCS's ownership of the intellectual property.

The Amended and Restated Operating Agreement described the creation of HHCS as follows:

*1.1. Organization.* On August 21, 1995, JOHN C. TOWNSEND organized COMMODORE HEALTHCARE SERVICES, LLC, a Tennessee limited liability company, by executing and delivering the Articles of Organization to the Tennessee Secretary of State in accordance with and pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement. On September 1, 1995, ROBERT R. HOLCOMB assigned five (5) United States Patent Applications and one (1) invention for which a United States Patent Application will be filed (descriptions of which are set forth in Exhibit 1.1) to the Company (as defined below) in exchange for an ownership interest in the Company which was pledged to JOHN C. TOWNSEND, as trustee of the TOWNSEND SCIENTIFIC TRUST, as collateral for an obligation of ROBERT R. HOLCOMB. On October 6, 1995, JOHN C. TOWNSEND amended the Articles of Organization changing the name of COMMODORE HEALTH SERVICES, LLC to HOLCOMB HEALTHCARE SERVICES, LLC. On October 9, 1995, the ownership interest in the Company owned by ROBERT R. HOLCOMB was foreclosed on by JOHN C. TOWNSEND as Trustee of the TOWNSEND SCIENTIFIC TRUST. On October 9, 1995, the original Members of the Company, HOLCOMB

---

**3.** The Assignment and License and Non–Disclosure Agreement were executed in February of 1996.

**4.** Dr. Holcomb and Mr. Townsend entered into this side loan agreement on October 9, 1995. The initial shares of HHCS held by the

HMT were held by Dr. Holcomb, as trustee for the HMT, subject to Townsend's, as trustee for the TST, right to foreclose upon such interest if payment of the underlying obligation did not occur. See *infra* note 6 and text for further discussion of the foreclosure.

MEDICAL TRUST, TOWNSEND SCIENTIFIC TRUST, HAL GERBER, GERALD F. EASTER, and THOMAS R. BUCKNER, executed an Operating Agreement . . .

The Operating Agreement states that the purpose of HHCS was to:

(i) commercialize the MagnaBloc patent and technology (see (b) below), and the other inventions which are the subject of the patent applications described in Exhibit 1.1, through such means, including without limitation, licensing, selling or manufacturing, as the Board of Governors of the Company (the "Board") shall determine;

. . . . .

(b) The Company purchased from Holcomb Technology Inc., a Tennessee corporation ("HTI"), a medical device patent (U.S. Patent Number 5,312,321, dated May 17, 1994) (the "MagnaBloc patent") pursuant to the authorization of the shareholders of HTI on December 15, 1995. The Company transferred the MagnaBloc patent and Magna Bloc technology to Acu–Pain, LLC, a newly formed Tennessee limited liability company ("Acu–Pain"), in exchange for 99.9% of the ownership interest of Acu–Pain. The other .1% ownership interest in Acu–Pain is owned by John C. Townsend, individually. The consideration for the purchase was the execution by the Company of a promissory note in the principal amount of $700,000 payable out of the net cash flow of Acu–Pain generated by the MagnaBloc technology, and the issuance of a 12.5% ownership interest in the Company to HTI shareholders, pro rata according to their ownership of HTI shares.

The Company also purchased the rights of Alatech, Inc., an Alabama corporation ("Alatech"), in an agreement between Alatech and HTI whereby Alatech owned the exclusive right to manufacture the MagnaBloc device, pursuant to the authorization of the shareholders of Alatech on November 28, 1995.

The original Members, Capital Contributions and Admission of New Members to HHCS, was specifically set forth in Section 2 of the Operating Agreement. The initial members were as follows:

| | |
|---|---|
| Holcomb Medical Trust and Townsend Scientific Trust | 60% |
| Hal Gerber | 2.5% |
| Gerald F. Easter | 2.5% |
| Thomas R. Buckner | 2.5%[5] |

The Amended and Restated Operating Agreement provides the following with respect to the ownership interests held by the Holcomb Medical Trust and the Townsend Scientific Trust:

(b) Forfeiture of Interest. The Percentage Interest of the Holcomb Medical Trust is subject to forfeiture to the Townsend Scientific Trust as set for in the Agreement between Robert R. Holcomb and John C. Townsend, as Trustee of the Townsend Scientific Trust.[6]

In addition, the Operating Agreement also described what independent activities were allowed by the members of HHCS, including Dr. Holcomb and Mr. Townsend:

---

**5.** The remaining interests consisted of Alatech (10%) and HTI shareholders (12.5%), HTI debenture holders (6.0%), HTI pool creditors (1.0%), and HTI warrant and option holders (3.0%).

**6.** The Agreement between Dr. Holcomb and Mr. Townsend as Trustee for the Townsend Scientific Trust allowed Townsend to foreclose upon Holcomb's interest in HHCS as a consequence of default. Townsend ultimately prevailed upon foreclosure of Holcomb's interest in HHCS so that Townsend, as trustee for the Townsend Scientific Trust, became the majority equity holder of HHCS.

*1.7 Independent Activities.* Except as may be set forth in the Employment Agreements between the Company and Robert R. Holcomb and John C. Townsend, and any other applicable agreements, each Member may, notwithstanding this Agreement, engage in whatever activities he or she chooses, whether the same or competitive with the Company or otherwise, without having or incurring any obligation to offer any interest in such activities to the Company or any Member....

Dr. Holcomb also entered into an Employment Agreement with HHCS. The Employment Agreement provides in relevant parts as follows:

2. *Duties.* The Employee is engaged by the Employer to act as Chief Scientific Officer, and in such position shall have responsibility for all scientific, medical, regulatory, patent and technology matters for the Employer including the development, enhancement and application of the Technology and the supervision of all research and development employees and consultants employed or retained by the Employer and shall competently and diligently carry out such responsibilities, as well as such other responsibilities consistent with such position, as may be reasonably assigned by the Employer from time to time.

3. *Extent of Services.* The Employee agrees to devote such amount of his working time, attention, energy and skill to the business of the Employer as shall be necessary to perform his duties hereunder in good faith and in a professional manner, which amount of time the Employer agrees may be less than the Employees' full working time. The Employer acknowledges that the Employee is presently engaged in other business activities that require a limited amount of his working time and, as such, the Employer agrees that the Employee may continue such engagements (and pursue any different or additional outside business activities), provided only that such activities do not prevent the Employees' performance of his duties hereunder and that any such time or activity that conflicts with the business of the Employer is disclosed to and approved by the Employer.

. . . . .

10. *Restrictive Covenant.*

(a) During the term of this Agreement and for a period of five (5) years thereafter, the Employee will not, within the territory (as hereinafter defined) (i) engage in any business activity in competition with any business, in which the Employer is engaged at any time during his employment, (ii) solicit such business from, or provide such services to any of the customers or accounts of the Employer, or (iii) become the employee of, or otherwise render services to or on behalf of, any enterprise which competes directly or indirectly with the business of the Employer. The Employee agrees that the limitations set forth on his rights to compete with the Employer are reasonable and necessary to the protection of the Employer.

Also, around the time of the creation of HHCS, the parties contemplated an assignment by Dr. Holcomb and other related entities of certain technology as specifically described in the Assignment dated February 20, 1996. The Assignment provides, in relevant part, as follows:

*RECITALS:*

A. HHCS is contemplating entering into a Research Agreement with

(the "Vanderbilt Agreement") with HOLCOMB MEDICAL RE-SEARCH INSTITUTE, a Tennessee nonprofit corporation ("HMRI"), and VANDERBILT UNIVERSITY ("Vanderbilt").

B. Pursuant to the Vanderbilt Agreement, HHCS represents that it has licensed to HMRI certain inventions as described in Schedule I attached thereto (the "Inventions").

C. Holcomb has heretofore assigned the MagnaBloc patent and certain patent applications to HHCS which are included in the inventions. The parties desire to have Holcomb by this Assignment assign to HHCS any and all of the Inventions which are not included in the patent and patent applications previously assigned by Holcomb to HHCS.

NOW THEREFORE, in consideration of Ten Dollars ($10.00) case on hand paid and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Holcomb does hereby sell, assign, transfer, and convey to HHCS any and all right, title and interest in and to the Inventions set forth in Exhibit A attached hereto, and hereby made a part hereof, throughout the world, and any applications for U.S. Letters Patent relating hereto, any and all divisions, continuations, continuations-in-parts, and reissues thereof, any and all Letters Patents of the United States and foreign countries which may be granted herefor, the same to be held and enjoyed by HHCS for its own use and benefit, and for the use and benefit of its successors, assigns, or other legal representatives, to the end of the term or terms for which said Letters Patent of the United States or foreign countries are or may be granted or reissued, as fully and entirely as the same would have been held and enjoyed by Holcomb if this Assignment and sale had not been made.

Exhibit A sets forth the following technology that is the subject of the Assignment from Dr. Holcomb to HHCS:

*Exhibit A*

*The Inventions*

Holcomb, individually, and Holcomb Healthcare Services, LLC, own or have proprietary rights to the following preexisting intellectual property including inventions, devices, products, procedures, processes, treatments, techniques, applications, and know-how directly or indirectly relating thereto or therefrom including present and pending patent applications:

A. Inventions, devices and products:

1) Quadrapolar permanent static magnetic devices

 a) Attachable discs—MagnaBloc™

 b) Shoe inserts—Ortho Energizer™

2) Quadrapolar electromagnetic devices—MagnaPower™

| | |
|---|---|
| a) Beds | e) Defibrillators |
| b) Tables | f) Muscular probe units |
| c) Chairs | g) Cerebral probes |
| d) Burn beds | h) Magnetic void |

3) Integrated devices with static magnetic units and pulsed electrical units—NeuroPace™

4) Magnetically oriented bionic devices

 a) Artificial limbs

 b) Artificial heart

 c) Artificial kidney

5) Magnetically modulated diagnostic imaging devices

6) Magnetic stereotactic devices

 a) Patented Bio Aqua Purge™ and similar devices which are designed and intended to generate predictably charged particles

b) Cross beam units

c) All applications of same

B. Processes and Procedures

1) Inhibit cellular electrical impulses by blockage of sodium channels.

2) Vascular dilation by blockage of cellular calcium channels.

3) Augmentation of drug efficacy by concentrating drug at target site and/or blocking or stimulating cellular receptors.

C. Treatments and Applications

1) All pain syndromes; trauma and postsurgical pain; angina pectoris; magnetic sympathectomy; regional anesthesia and surgical pain; headache pain.

2) Vascular insufficiencies; wound, abscess and burn healing; impotency; block central vasospasm; hypertension; reduction of infarct (cerebral and cardiac) size.

3) Motion, space sickness (vertigo)

4) Repetitive use syndromes: Carpal tunnel; tennis elbow; rotator cuff

5) Neuropsychiatric disorders (depression)

6) Alter seizure activity

7) Alter fertilization process

8) Alter growth of malignant cells

9) Control of inflammation related conditions; Optic neuritis; renal diseases/glomerulonephritis; arthritis; multiple sclerosis

10) Control and reversal of atherosclerosis

11) Resolution of sickle cell crisis

12) Control of cardiac arrhythmia

13) Methodologies for generating and manipulating the distribution of charged particles and surface charges

Thus, with the creation of HHCS, Dr. Holcomb became a restricted part owner, Board Member, and Chief Scientific officer of HHCS. He was free to pursue other interest and employment so long as it did not conflict with his non-compete and other restrictions set forth in the Employment Agreement. Dr. Holcomb also assigned all the technologies covered in Exhibit A to HHCS. The License and Non-Disclosure Agreement allowed HMRI the "single purpose" research and development of all devices, treatments, procedures, techniques, products, processes knowhow and applications covered under the Assignment so that HMRI could continue magnetic research with Vanderbilt. Under the License and Non-Disclosure Agreement, however, HHCS retained all commercialization rights in the Inventions and any profits resulting therefrom.

Following the creation of HHCS, Dr. Holcomb continued to create Holcomb-controlled entities including some of the named defendants in these adversary proceedings. The intertwined nature of these entities is mind-numbing, but a brief, and probably only partial synopsis follows:

| Date Created | Name of Business | Business Purpose |
| --- | --- | --- |
| 1995 | Holcomb Medical Trust | Hold interest in HHCS until transferred to Holcomb International, LLC |
| Oct. 18, 1995 | Acu–Pain LLC | Originally formed to license MagnaBloc ™ technology but terminated license on 11/5/98 with the signing of the Amway license |
| Dec. 18, 1997 | Holcomb International LLC | Formed as a limited liability holding company. Members of Holcomb International exchanged |

| | | |
|---|---|---|
| | | their shares for shares in Quart Ltd. Holcomb International LLC post-petition in 2001. Holcomb International transferred all assets to Quart Ltd. |
| Jan. 16, 1998 | Holcomb Companies LLC | Established for research and development of water treatment products, drug enhancements and other products with IPE. Holcomb Companies was wholly owned by Holcomb International |
| 1998 | Virtual Manufacturing & Development, LLC | A wholly owned subsidiary to set up and assemble MagnaBlocs ™ |
| 1998 | ROM Technologies | Among other things, this is a company created to handle water treatment technologies. Owned 100% by Demeter |
| 1998 | Luca Enterprises Ltd. | An Isle of Man entity owned by Holcomb Investments LP |
| 1999 | Flavor Tech LLC | Either was never activated or possibly owned artificial sweetener technology. It has never had revenues but does file tax returns. |
| 1999 | Academic Technology Foundation | A foundation created when MagnaBloc ™ licensed to Amway such that a portion of proceeds would go to the foundation to support neuroscience research at Vanderbilt |
| 1999 | Holcomb Scientific Creations LLC | A research and development company that Dr. Holcomb used to pay for expenses for different developments. It receives a $35,000 per month research and development fee from Demeter. One employee: Barbara McCullough. Technologies include areas of food enhancement, fragrances, personal care products, home care products, medical, energy aquaculture, printing dyes and inks, agriculture, inorganic polymer electret (IPE), fuels, commercial and industrial cleaners, steel replacement, self cooling can, cloud seeding, shoe insole shock absorber, spill containment, crash resistant convertible top |
| July 23, 1999 | Fluide Electret LLC | Fluide Electret LLC was never activated but was created to develop and market fuel emissions products |
| July, 1999 | Pharmako LLC | Pharmako LLC was never activated but was created to do research on drug reformulation |
| 1999 | Newawk LLC | Newawk LLC was never activated. |
| 2000 | Emissions Control LLC | 100% owned by Demeter, it has technology that reduces emission from gasoline burning internal combustion engines. An active company with one employee, Dr. Holcomb's son, Andrew Holcomb, who works on fuel research and testing. |
| 2000 | Quart Ltd. | An offshore, Isle of Man entity that owns Minos Investments, LLC |
| Jan.25, 2001 | Electro–Chem LLC | Has technology dealing with wood treatment process. Electro–Chem is 50% owned by Demeter |
| April, 2001 | Green Coal, LLC | Owned 100% by Demeter, formed to develop coal burning technologies |

| May, 2001 | Demeter Systems, LLC | A holding company owned by approximately 160 individuals and some other companies and holding ROM Technologies LLC, Fluide Electret LLC, Flavor Tech LLC, Newawk LLC, Pharmako LLC, Emissions Control LLC, and Green Coal LLC. Demeter was created to develop and market its wholly owned subsidiaries technologies (coal, fuel, wood, and water). Demeter has 4 employees: Julia Hubbard, Paul Touchton, Sidney Bogardus and Darrin Benton. Dr. Holcomb performs research for Demeter through an agreement with Holcomb Scientific Creations LLC. |
|---|---|---|
| May, 2001 | Minos Investments, LLC | Entity that owns an interest in Demeter. |
| July, 2001 | SGT Technology | A technology holding company under Luca Enterprises, holding several of Dr. Holcomb's claimed patents, and also licenses patents to Demeter for gas emissions, wood treatment and water treatment. |
| Post petition 2001 | Selene Holdings LLC | 100% owned by Luca Enterprises Ltd. |
| Post petition 2001 | Aether Power, LLC | Owned by several individuals and the majority owner is Selene. Aether is going to share some technology with Demeter and develop some new products. |
| Unknown | Holcomb Investments, LP | Partners include Dr. Holcomb, his wife, Holcomb Management, Inc., and the Robert R. Holcomb 2004 Annuity Trust. Assets include a majority interest in Quart Ltd, 100% of the outstanding shares of Water Resources Technology Inc., a corporation that has never been activated, and a controlling interest in Luca Enterprises, Ltd. |

While all of these entities were being formed, developed, and yet to be created, matters at Holcomb Healthcare Services LLC were starting to deteriorate. On September 29, 1997, Gerald R. Easter resigned from the Board of Governors.[7] It was Dr. Holcomb and Mr. Easter's position that, Easter's resignation meant that HHCS was then without a duly authorized Board under the terms of the Amended and Restated Operating Agreement. Upon that assumption, Dr. Holcomb took over duties as self-appointed Chief Manager. According to Dr. Holcomb's testimony, HHCS was without a duly authorized Board from Mr. Easter's resignation in 1997 until a new Board was elected on May 12, 2000. During that period, the Board continued to meet, and Dr. Holcomb sought the advice of the board "from time to time," even though he considered the Board not duly constituted. According to the testimony of Thomas R. Buckner,[8] an initial Member, and occasional Board

---

7. It was Mr. Easter's resignation that allowed Dr. Holcomb to ostensibly gain control of HHCS by claiming there was no duly constituted Board. Dr. Holcomb thereafter authorized Mr. Easter to be paid $35,000 by HHCS for his alleged legal services.

8. Mr. Buckner is a 1972 graduate of the Vanderbilt Law School and a partner in the Memphis law firm, Apperson, Crump & Maxwell.

Member, and at times attorney for HHCS, once Mr. Easter resigned, Dr. Holcomb began to run HHCS on his own, making decisions for the company without seeking Board approval or membership approval.

By Dr. Holcomb's own account, he took, at least, the following actions between September 29, 1997 until May 12, 2000 when a new Board was elected, as Chief Manager of HHCS:

1. Created Academic Technology Foundation with Amway Corporation benefitting Vanderbilt University
2. Raised [his] Robert R. Holcomb's salary to match incoming officer's salaries effective 1/1/98.[9]
3. Declared bonus per employment agreement in 1999
4. Created new positions and hired personnel:
 a. Jim Morton, interim president
 b. Ray Larson, president
 c. Julia Hubbard, CFO
 d. Jenna Morey, Nurse Practitioner
 e. Sidney Bogardus, Business Consultant
 f. Paul Arcangeli, Information Officer
 g. Bradley W. Worthington, M.D., Clinic Director
5. Opened, operated and funded Vanderbilt University Pain Clinic
6. Created Virtual Manufacturing and Development LLC, a wholly owned subsidiary, to create prototypes and assemble MagnaBloc ™ for sale (prior to Amway Agreement)
7. Transferred interest in Holcomb Healthcare Services LLC (Approx.41%) from Holcomb Medical Trust to Holcomb International LLC (9/98).

8. Negotiated and signed License Agreement with Amway Corporation
9. Purchased life insurance for Dr. Holcomb and Jim Morton with company as beneficiary
10. Developed Amway distributor training program with VU School of Nursing
11. Assumed liability of the Research and Development program with VU in 1999
12. Created Student Scholarship (Paul McDonald) for Neuromagnetics Program
13. Hired Salans Hertzfeld Hellbom Christy & Viener as legal counsel
14. Hired Gerald F. Easter as legal counsel
15. Conducted all other business, affairs of the company and made all decisions regarding these matters and performed any and all other acts or activities customary or incidental to the management of the company's business.
16. Operated on advice of the former board. Although not duly constituted, their advice was sought from time to time.

On November 5, 1998, during Dr. Holcomb's interim tenure, HHCS licensed the MagnaBloc™ technology to Amway Corporation. Pursuant to the license agreement, HHCS granted certain rights in and to certain patents and patent rights in exchange for HHCS's right to receive certain royalty payments from MagnaBloc™ sales. The Amway licensing agreement was a worldwide agreement, and for the first time, HHCS had a real source of income. According to Mr. Buckner, the issue in 1999 was how the income would be spent.

9. Dr. Holcomb hired and then set the salary for the incoming officers.

Throughout much of 1999, Buckner, Townsend, and other HHCS members began to question Dr. Holcomb, Jim Morton, Julia Hubbard, and Barbie McCullough, among others, about the amount of royalty payments coming in, and more importantly how the money was being spent. By the fall of 2000, the HHCS members had broken apart into factions, some with allegiance to Dr. Holcomb, some with allegiance to Mr. Townsend, and others somewhere in between. In the summer of 2000, Mr. Townsend, who was on the Audit Committee of HHCS, felt that he could not get a thorough analysis of the finances of HHCS. He hired an accounting firm, Jackson, Howell and Associates, P.C. ("JHA") to conduct a limited books and records audit. According to Townsend, the JHA report only raised further questions.

In October of 2000, Mr. Townsend sent a Memorandum to Jim Morton, President of HHCS, and Julia Hubbard, CFO of HHCS outlining some of his most serious concerns that were discussed at the October 5, 2000 Board Meeting and included: (1) failure of Dr. Holcomb, Mr. Morton, or Ms. Hubbard to provide evidence of authorization for amounts paid by HHCS to or for Holcomb related entities; (2) the financial cash crunch of the company created by what Mr. Townsend characterizes as "past payments of non HHCS bills"; (3) Dr. Holcomb's self-renewal of his annual employment agreement and non-Member approved salary increase from $150,000 per year to $250,000 per year; (4) bonus payments paid to Dr. Holcomb or accounted for bonuses by offsets against personal advances that were not reflected in Dr. Holcomb's income tax W–2 forms; (5) concerns that the Members had not been made aware of the entire AmWay revenue stream to Vanderbilt, HHCS, the employees, and to Dr. Holcomb and his related entities; (6) reimbursement of undocumented expenses for Dr. Holcomb and Gerry Easter; (7) Dr. Holcomb, Jim Morton, Julia Hubbard and other key officer's positions as signatories on the HHCS bank account while unauthorized advances are occurring to or for Holcomb related companies that Holcomb, Morton and Hubbard have financial interests in; (8) Dr. Holcomb's alleged assumption for HHCS of a $2,000,000.00 Vanderbilt debt without Board or Member approval; (9) Dr. Holcomb's conflict of interest as acting member of HHCS in dealings with Vanderbilt where he is also employed; (9) Gerry Easter's alleged resignation of the Board was ineffective to give Dr. Holcomb "control" over HHCS; (10) the failure to account for approximately $7,900,000.00 in revenues from AmWay since 1998; (11) HHCS's largely undocumented legal and accounting expenses of more than $1,400,000.00 since 1998; (12) Mr. Morton's lack of action in cutting expenses when HHCS was operating at a loss of $100,000.00 to $250,000.00 per month according to the current budget; (13) the status of the Assignments of Dr. Holcomb's intellectual property as promised was unknown to Members and members of the Board; (14) Dr. Holcomb's announcement at the October Board Meeting that he was pursuing a transaction with AmWay to sell a majority of HHCS to Amway; and (15) Dr. Holcomb's plans for Isle of Man entities for Holcomb International. A Members Meeting was scheduled for November 2, 2000, and Mr. Townsend recommended the following actions be taken in light of the current crisis: (1) changing the Amended and Restated Operating Agreement to alleviate concerns over an improperly constituted Board; (2) hiring of independent legal counsel with no connection to Vanderbilt, Amway, or any majority HHCS member; (3) require approval of a super majority (80%) to assume any

debt in excess of $50,000; (4) a specific prohibition against any conflict of interest transaction without 2/3 Membership approval; and (5) replacement of any Board of Governors Members wishing to resign who have not properly done so in the past.

No understanding was reached to resolve the continuing financial distress of HHCS. With tensions between conflicting factions within HHCS at a breaking point, and after reviewing the Jackson Howell report, Mr. Townsend gave notice of invocation of arbitration procedures to resolve disputes among members as provided in Section 14.13 of the Amended and Restated Operating Agreement.[10] Mr. Townsend, as trustee for TST, sought to foreclose on Dr. Holcomb's (and/or related entities) interest in HHCS for nonpayment under an agreement of the parties.

Also going on during this time was Mr. Townsend's legal action against HHCS and Amway, seeking to enjoin further royalty payments by Amway until such time as the issues of alleged misappropriations and conflicts of interest were resolved within HHCS. HHCS Board Members discussed the lawsuit and the possibility of seeking bankruptcy protection at the March 30, 2001 Board Meeting. Present at that meeting were Dr. Robert Holcomb, Jim Morton, Thomas Coplin, Julia Hubbard, and by phone, William M. Humphrey. Mr. Townsend was not on the Board of Governors at this time.

The Chancery Court in Shelby County, Tennessee then enjoined Amway to hold any royalty payments in excess of $70,000 per month, and prohibited HHCS from spending more than $70,000 per month. In a specially called telephone meeting of the Board of Governors attended by Dr. Holcomb, Jim Morton, Thomas Coplin, William M. Humphrey, and Julia Hubbard, on April 15, 2001, Dr. Holcomb informed the Board of the chancery court's injunction. Dr. Holcomb also advised, according to the Board's Minutes, as recorded by Julia Hubbard, that it was his "understanding that after much discussion about this, three creditors on April 13, filed an Involuntary Petition with the United States Bankruptcy Court for the Middle District of Tennessee pursuant to Chapter 7, Title 11, which is an insolvency petition." The purpose of the April 15, 2004 Meeting was to authorize bankruptcy counsel to file a chapter 11 case the next business day and combine the two cases into one Chapter 11 case. Dr. Holcomb indicated that "we have no other choice than to seek the protection of Chapter 11 reorganization and then go forward with a plan and try to get all our creditors in and cooperatively work through this and eventually work ourselves out of it." Dr. Holcomb told the remaining board members that he, Jim Morton, and Vanderbilt representative Dr. Harry Jacobson, had met with bankruptcy counsel, Robert Gonzales, to discuss bankruptcy as a possible response to the Shelby County court's injunction. The Board voted on Sunday, April 15, at approximately 10:00 p.m. to authorize Mr. Gonzales to file a chapter 11 petition for HHCS as soon as possible.

10. Section 14.13 provides in relevant part as follows:

> *Arbitration.* Any controversy, claim or dispute arising out of or relating to the operation of the Company, this Agreement, or the offering or sale of any Membership Interests, either during the existence of the Company or afterwards, between the Members, the Economic Interest Owners, their as-

signs, their Affiliates, their officers, directors, attorneys, or agents, any participating broker-dealers, and/or their respective representatives, shall be settled by arbitration in Memphis, Tennessee....

Section 14.13 then outlines the specific procedures to invoke arbitration proceedings and describes the binding effects of an arbitration decision.

Previously, on April 13, 2001, an involuntary petition had been filed against HHCS by three then-employees of the Holcomb Healthcare Services, LLC ("HHCS" or "debtor"): Julia Hubbard, Chief Financial Officer and current Board Member, Barbara McCullough, Dr. Robert Holcomb's personal assistant, and Sidney T. Bogardus, Sr., the debtor's vice president. All alleged unpaid wages with their total claim amounting to $47,920.81. As testified to by Julia Hubbard, the involuntary petition was Dr. Robert R. Holcomb's idea, and the petitioning creditors' attorney, Jack E. Seaman, was obtained by Dr. Robert Holcomb. Ms. Hubbard admitted at trial that she never even met with Mr. Seaman before filing the involuntary petition.

HHCS's General Ledger shows check number 3368 in the amount of $3,000.00 written on April 13, 2001 payable to Mendes & Gonzales as bankruptcy counsel to file the HHCS voluntary chapter 11. Julia Hubbard wrote that check on the very day she joined as a petitioning creditor for the sham involuntary petition against HHCS. This check was written before the specially called Board Meeting on April 15, 2001 supposedly to authorize the filing. Despite these nefarious and underhanded dealings, neither Julia Hubbard nor Dr. Holcomb informed the other Board Members at the telephonically arranged 10:00 p.m. Board Meeting that it was Hubbard, with Holcomb's duplicity, who arranged the involuntary.[11] Ms. Hubbard was the recording secretary at the April 15, 2001 Board Meeting, and the Minutes show she never said a word about the involuntary filing. Dr. Holcomb mentions only that three creditors filed the involuntary petition, but does not disclose their identity or that he engineered the filing.

Further proof of Dr. Holcomb's masterminding of the involuntary filing is Mr. Gonzales' follow-up letter to Dr. Holcomb, Jim Morton and Gerald Easter from their initial April 3, 2001 meeting. In that letter, Mr. Gonzales outlines the typical chronology of events in a chapter 11, and estimates financial costs. In page 2 of the letter, Mr. Gonzales estimates time that he would spend on certain "first day motions" in a chapter 11 filing. Specifically listed as an item is a "Motion to convert involuntary into voluntary case." In the court's extensive experience, a motion to convert an involuntary filing to a voluntary filing is by no means a typical first day motion. To the contrary, this specific reference lends further credence to the guile of Dr. Holcomb in engineering the involuntary petition by manipulating his financially dependent employees and colleagues.

In an April 18, 2001 letter to the Members of HHCS, Mr. Morton writes to inform the members of the HHCS voluntary bankruptcy filing. He states, extremely ambiguously, that three creditors filed an involuntary petition against the company, but does not reveal that two of the three petitioning creditors were officers and insiders. Morton states that HHCS "responded" with a voluntary filing because it could not truthfully fight the fact that HHCS had not been paying its debts as they became due. The letter in no way requests the required Member approval for the filing, but only disingenuously in-

---

11. Ms. Hubbard, Mr. Bogardus, and Dr. Holcomb were officers of HHCS. "It is well established that officers and directors of a corporation owe a fiduciary duty to the corporation and its members ... and, while occupying such a position of trust, must act in the utmost good faith." *Efird v. Clinic of Plastic and Reconstructive Surgery, P.A.* 147 S.W.3d 208, 221 (Tenn.Ct.App., 2003) (quoting *Heffernan v. Heffernan, Ballinger, Pounds and Yarbrough, Inc.*, No. 02A01–9504–CH–00080, 1996 WL 512639, at *4 (Tenn.Ct.App. Sept.11, 1996)). These actions are clearly a breach of their fiduciary duties.

forms them of these "surprising" turn of events.

Dr. Holcomb's obvious motive in creating the appearance of a properly filed involuntary petition was to evade the terms of HHCS's Amended and Restated Operating Agreement. The Operating Agreement contained the following restriction:

*5.6 Restriction on Authority of Board.* Without the consent of Members holding a Two–Thirds Interest, the Board shall not have the authority to:

. . . . .

(g) cause the Company to voluntarily take any action that would cause a bankruptcy of the Company;

Thus, the Board was unable, without a 2/3 member interest vote, file a bankruptcy petition. Nonetheless, not only did Dr. Holcomb engineer the involuntary petition, he then persuaded the Board, on April 15, 2001, to file a voluntary chapter 11 petition without appropriate Member approval.

Once the chapter 11 petition was filed and the involuntary case converted and combined into the chapter 11 petition, HHCS's Holcomb-led Board of Governors never requested relief from the AmWay royalty injunction that had supposedly crippled the company causing the hasty chapter 11 filing. Instead, the immediate relief sought by Dr. Holcomb was the filing of an adversary to protect and promote his personal interests. The action was to enjoin the pending arbitration with John Townsend who was seeking to foreclose on Dr. Holcomb's membership interests in HHCS.[12] Dr. Holcomb also managed to create several new business entities and obviously attempted to shift assets away from potential HHCS creditors and Mr. Townsend. For instance, on September 22, 2000, just as matters were getting particularly heated at HHCS, and just days after Townsend had served notice of his intent to foreclose on Holcomb International's interest in HHCS, Dr. Holcomb exchanged his interest in Holcomb International LLC for voting shares in the Isle of Man entity, Quart, Ltd., and likewise had his coterie of insiders of Holcomb International exchange their shares for non-voting stock in Quart Ltd. After the bankruptcy petition was filed, Dr. Holcomb created, Demeter Systems LLC, Green Coal, LLC, Minos Investments, LLC, SGT Technology, Selene Holdings LLC, and Aether Power, LLC. While many of Dr. Holcomb's entities were either never activated, currently inactive, not operating for their originally intended purpose, or simply holding companies, curiously, the most active companies were created post-petition and purported to hold many of the assets claimed to be owned by Dr. Holcomb.[13] Not only is the timing of forma-

---

**12.** In that adversary, the parties agreed to postpone the imminently impending arbitration from May 1–2, 2001 until June 26–27, 2001.

**13.** For example, Holcomb Investments, was at the top of Dr. Holcomb's structural chart, and it held a majority interest in Quart Ltd., the Isle of Man entity, in which Dr. Holcomb held the majority interest. Quart owned a majority interest in Minos Investments, an entity with majority ownership in Demeter. Demeter wholly owns Green Coal LLC, ROM Technologies, and Emissions Control (created prior to the petition and transferred to Deme-

ter). In these entities, were the intellectual property and licensing of Dr. Holcomb's coal, water, wood, and other technologies. Holcomb Investments also wholly owns Luca Enterprises, another Isle of Man entity. Luca wholly owns another entity created after the bankruptcy was filed, SGT Holdings, which holds many of the patents Dr. Holcomb claims to own. Luca also wholly owns Selene Holdings, which is the majority holder in Aether Power. SGT licensed to Demeter a field of use license for the fuels, gasoline, diesel fuels, treatment of coal, water treatment and wood treatment.

tion of these entities patently suspect, but so is the organizational structure that included offshore entities that were allegedly beyond the reach of United States court jurisdiction.

In yet another example of Dr. Holcomb's evasive maneuvers, he executed a document, post-petition, to transfer the wholly owned subsidiary of HHCS, Virtual Manufacturing, from HHCS to Holcomb Companies in May, 2001. Even though Julia Hubbard stated that the documents had been incorrectly prepared by the attorney, the timing of such a "mistake" adds to the pattern of Dr. Holcomb's acting to protect what he perceived were his assets. Perhaps most troubling is Dr. Holcomb's "marshaling" of his patents into SGT Holdings, which was under the umbrella of an offshore entity (Luca) after the bankruptcy petition was filed.[14]

Soon after the case was filed, Holcomb's foot dragging, unwillingness to fairly participate in the legal process, and obstinance in obeying orders of this court became immediately apparent. An adversary proceeding was filed by U.S. Wax & Polymer, Inc. against HHCS concerning issues unrelated to the current proceedings. Dr. Holcomb was the subject of no less than three different motions to compel to participate in the discovery process. After ordering Dr. Holcomb to comply with certain discovery requests without success, the court sanctioned Dr. Holcomb more than $9,000 in attorney fees. The reference was withdrawn in that adversary proceeding by the United States District Court, and the court is unaware of Dr. Holcomb's ultimate compliance with the court's orders.

Even after the imposition of more than $9,000.00 in sanctions, Dr. Holcomb continued his misconduct in this bankruptcy case. Following Mr. Townsend's success in the arbitration to foreclose on Dr. Holcomb's membership interests, the court had to order Dr. Holcomb and former management to allow the new management of HHCS to collect its own mail and control its own phone numbers. A second contempt motion on the same subject was brought up again, but was ultimately settled.

Once the new management was established as the debtor-in-possession, it, along with its Unsecured Creditors Committee began formally investigating the status of HHCS's assets, possible causes of action and potential liabilities. Vanderbilt University brought an adversary proceeding against HHCS for declaratory judgment relative to the amount of its allowable claim, if any. In late 2002, HHCS hired Maffey & Weber as special counsel to the debtor-in-possession to prosecute any potential actions against any interested party. The debtor-in-possession then brought actions against: (1) Gerald Easter (Adversary Proceeding Number: 302–0798A); (2) former management including Dr. Holcomb, Julia Hubbard, Jim Morton, Barbie McCullough, Thomas Coplin, William Humphrey, and Sidney Bogardus (Adversary Proceeding Number 03–0141A); (3) Grannis Whisenant & Associates, PC, Paul Arcangeli, Ray Larson, Robert Green and Nelly Green Fargarson & Summers for alleged preferential transfers and fraudulent conveyances (Adversary Proceeding Number: 303–0198A); (4) Amway Corporation (Adversary Proceeding Number:

---

**14.** SGT was the entity that held the patents. That entity was created post-petition, and was named for former HHCS vice president and employee Sidney Bogardus, former HHCS attorney Gerry Easter, and former HHCS attor-

ney Tony Joseph. According to Mrs. Hubbard's testimony, the patents held by SGT were transferred from other entities to SGT in 2001.

303–0200A); (5) Ernst & Young as former accountants of HHCS (Adversary Proceeding Number: 303–0201A); (6) Salans Hertzfeld Heibronn Christy & Viener, Karon S. Walker, and Anthony Joseph (Adversary Proceeding Number: 303–0202A); (7) Dr. Holcomb and various of his Holcomb-controlled entities in this current matter (Adversary Proceeding Number: 303–0203A); and (8) Dr. Holcomb and various of his Holcomb-controlled entities in the other current matter (Adversary Proceeding Number: 304–0386A).

The two adversary proceedings that have been consolidated here for purposes of trial, and formally consolidated by Order dated October 8, 2004, like the main bankruptcy case, have had no shortage of dilatory procedural gymnastics by Dr. Holcomb and his legal counsel. In adversary proceeding 03–203A, Dr. Holcomb or his counsel were the subject of no less than five motions to compel compliance during discovery or for sanctions for failure to comply with discovery. Dr. Holcomb, and/or his counsel were sanctioned monetarily by the court for their failure to comply with court orders no less than three times, just within the context of adversary proceeding number 03–203A. Dr. Holcomb and/or his legal counsel have repeatedly ignored court mandates, disregarded discovery procedures, and proved unresponsive or uncooperative with opposing counsel in resolving administrative aspects of the cases.[15] Despite these obstacles, the court conducted a week-long bench trial on the issues raised in the consolidated adversary proceedings during the October 26, 2004 week.[16]

### III. Issues

The pretrial order in adversary 04–0386A sets forth the following issues to be decided at trial:

1. Whether the plaintiff's action is a core matter.

2. On which [issues], if any, are the Defendants entitled to a jury trial.

3. Whether HHCS has full and legal right and title to all technologies, patents, and patent applications incorporating the quadrapolar mag-

---

**15.** Dr. Holcomb has had at least three different attorneys during the course of the bankruptcy case and pending adversary proceedings. The pattern of disregard for this court's orders permeated each and every attorney hired by Dr. Holcomb. Thus, the court attributes much of the "foot-dragging" that has occurred during the bankruptcy case to these attorneys' client, namely, Dr. Holcomb.

**16.** Despite the heavy monetary sanctions this court has been forced to levy against Dr. Holcomb and his related entities for their failure to cooperate, unbelievably, certain patent information that was ordered turned over before trial under a confidentiality agreement was not turned over until after the proof had closed at the end of the week-long trial. As a result, the plaintiff was prejudiced by its inability to offer proof of ownership during trial. Because of the long history of missed opportunities by these defendants, the court finds that a severe sanction is warranted. The

court therefore *ORDERS* a default judgment is hereby *GRANTED* against the following defendants as to the ownership of all patents and patent applications not produced by the defendants but claimed to be owned by any of the following defendants as of October 8, 2004: Robert R. Holcomb, Quart Ltd., Holcomb International, LLC, ROM Technologies, LLC, Holcomb Companies, LLC, Holcomb Scientific Creations LLC, Flavor Tech, LLC, Newawk, LLC, Fluide Electret, LLC, Green Coal, LLC, SGT Technology Holdings, LLC, Emissions Control, LLC, Holcomb Management, Inc., Water Resources Technology, Inc., Holcomb Investments, L.P., Holcomb Medical Trust, Minos Investments, Holcomb Medical Research Institute, Demeter Systems LLC, Luca Enterprises Ltd., Selene Holdings LLC, Aether Power, LLC, and Holcomb Scientific, Inc.. The court finds that the debtor, Holcomb Healthcare Services, LLC is the rightful owner of all patents and patent applications that were not turned over as provided herein.

netic array and steep field gradient technologies.

4. Whether any Defendants should be enjoined from engaging in any conduct contrary to HHCS's ownership interest in and to the quadrapolar magnetic array and steep field gradient technologies, including research, development, and marketing of that technology.

5. Whether Holcomb and Holcomb Medical Research Institute has violated the terms of their agreements with HHCS by disclosing confidential information to other parties.

6. Whether Holcomb has engaged in competitive business activities in violation of the terms of the Employment Agreement with HHCS

7. Whether the employment agreement and the assignment agreement at issue between the plaintiff and the Defendant, Robert R. Holcomb bar all of the Plaintiff's claims because the nature of the intellectual property and patents assigned to Plaintiff are plainly defined in those documents and have nothing to do with the property which plaintiff now seeks to expropriate.

8. Whether the terms "quadrapolar magnetic array" and "steep field gradient" describe anything other than phenomenon occurring commonly in nature.

9. Whether paragraph 3 of the employment agreement constitutes a complete documentary defense to all of the Plaintiff's claims because the Plaintiff long ago expressly and contractually acknowledged and agreed that Defendant Robert R. Holcomb has been and would be engaged in research and scientific developments having nothing to do with Plaintiff's business.

10. Whether Plaintiff's claims are barred by the doctrines of estoppel and unclean hands.

11. Whether Plaintiff's Complaint appropriately states claims for conspiracy, conversion, misappropriation of trade secrets in violation of state law, and unfair competition and declaratory and other injunctive relief against 18 defendants without ever (a) identifying the property allegedly converted and misappropriated, (b) identifying the role of each defendants in those wrongs.

12. Whether under Rule 9 of the Federal Rules of Civil Procedure, which requires that all allegations of fraud be set forth with particularity, should the Complaint be dismissed.

13. Whether Luca Enterprises is subject to the jurisdiction of the Court.[17]

17. The defendants argue in their post-trial brief that they "timely lodged an objection to assertion of long-arm personal jurisdiction over Quart and Luca on the grounds that these entitles lacked any contact with the United States." The defendants argue that the plaintiff offered no proof at trial that either of these defendants engaged in any sort of business in the United States or had sufficient contacts with the United States, and the court should dismiss these defendants for lack of personal jurisdiction.

As to Quart Ltd., the court has already found that Quart was a properly served defendant and denied the defendant's motion to dismiss for lack of jurisdiction. *See* Order entered 04/09/04, Docket No. 96, Adv. No. 303–203A. Furthermore, Quart has participated in these proceedings and waived any further assertion that personal jurisdiction is lacking.

As to Luca Enterprises, the court finds that the plaintiffs have shown sufficient contacts to assert jurisdiction. Julia Hubbard, current

14. Whether HHCS is entitled to the accounting and other relief asserted in Paragraphs 58–60 of the Complaint.

15. Whether the Defendants are liable to Plaintiff for exemplary damages.

16. Whether the Defendants are liable to Plaintiff for attorney fees.

17. Whether the Defendants are liable to Plaintiff for prejudgment interest.

In the consolidated adversary proceeding (Issues in Adversary Proceeding Number 03–203A), the following issues were also set forth in the Amended Agreed Pretrial Order:

1. Whether the Holcomb entities or any portion thereof, should be substantively consolidated.

2. Alternatively, whether the Holcomb entities, or any portion thereof, should be determined to be the Debtor's alter egos under Tennessee law.

3. Whether the Defendants are liable to Plaintiff for fraudulent transfers under 11 U.S.C. § 548(a)(1).

4. Whether Defendants are liable to Plaintiff for fraudulent transfers under Tennessee Law.

5. Whether Defendants are liable to Plaintiff for exemplary damages.

6. Whether Defendants are liable to Plaintiff for attorney fees.

7. Whether Defendants are liable to Plaintiff for prejudgment interest.

Additionally, the defendants included one additional issue that was contested by the debtor:

* Whether the reference should be withdrawn and the proceedings should be transferred to the United States District Court for the Middle District of Tennessee for a trial before a jury?

The court first addresses the defendants' issues concerning a jury trial in these proceedings, and then the substantive issues of the cases.

### A. Jury Demand

██ HHCS's complaint in Adversary Number 03–203A was filed on April 11, 2003 and amended on October 14, 2003. No answer was filed by the defendants (with the exception of one separately represented defendant) until May 20, 2004.[18]

---

CFO of Demeter, testified that all of the books and records of Luca are maintained at her offices in Nashville, Tennessee. Accordingly, the court likewise denies any belated motion of Luca Enterprises for dismissal.

**18.** In adversary 03–203A, answers were first due on May 19, 2003. This date was later extended when the defendants filed Motions to Dismiss. The new answer date, as provided by the June 27, 2003 Pretrial Order was July 3, 2003. Again, no timely Answer was filed. HHCS then amended its complaint on October 14, 2003, and an October 20, 2003 order gave defendants who had not responded ten days following service of the amended complaint to respond. Once again, no timely Answer was filed. A new Summons was issued on December 23, 2003 providing for a new answer date of January 23, 2004. The

defendants re-filed an almost identical version of their previous motion to dismiss that had been filed on December 29, 2003. The matter was set for hearing and the court again denied the defendants' motion to dismiss. Still, no Answer was filed by the defendants. The debtor again amended its complaint as to Aether Power LLC, and a new Summons was issued providing Aether Power LLC until April 14, 2004 to file an Answer. Aether Power LLC did not file a timely Answer. Finally, on May 20, 2004, a year after the first Answer date, Quart Ltd., Holcomb International, LLC, ROM Technologies, LLC, Electro–Chem, LLC, Holcomb Companies, LLC, Holcomb Scientific Creations, LLC, Flavor Tech LLC, Newawk, LLC, Fluide Electret, LLC, Green Coal, LLC, SGT Technology Holdings, LLC, Emissions Control, LLC, Pharmako, LLC, Holcomb Technology, Inc.,

The answer was indorsed "Defendants Demand Trial by Jury." HHCS's complaint in Adversary Number 04–386A was filed March 24, 2004. The defendants never filed an Answer in this adversary proceeding, and there is no jury demand made by the defendants in accordance with Federal Rule of Bankruptcy Procedure 9015 making Federal Rule of Civil Procedure 38 applicable in bankruptcy.[19] Although the two adversary proceedings were consolidated for purposes of conducting simultaneous trials, there was no formal consolidation of the adversary proceedings until October 8, 2004, less than three weeks prior to trial.[20] No Answer was ever filed on behalf of the 04–0386A adversary defendants and no jury was demanded in 04–0386A.

Even assuming that a jury was properly demanded in both adversaries, which the court does not find in adversary 04–0386A, to the extent that the defendants were ever entitled to a jury trial,[21] the defendants nonetheless waived all rights to a jury trial. In adversary 03–0203A, the jury was properly demanded by its indorsement on the Answer.[22] The pretrial

Holcomb Management, Inc., Water Resource Technology, Inc., Novatech, Inc., Holcomb Investments, LLP, Demeter Systems, LLC, Academic Technology Foundation, and Aether Systems, Inc. filed an Answer. It was at this time, that defendants first indorsed any pleading with a jury demand.

19. Federal Rule of Civil Procedure 38 provides:

*Rule 38. Jury Trial of Right*
*(a) Right Preserved.* The right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by statute of the United States shall be preserved to the parties inviolate.
*(b) Demand.* Any party may demand a trial by jury of any issue triable of right by a jury by (1) serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue, and (2) filing the demand as required by Rule 5(d). Such demand may be indorsed upon a pleading of the party.
*(c) Same: Specification of Issues.* In the demand a party may specify the issues which the party wishes so tried; otherwise the party shall be deemed to have demanded trial by jury for all the issues so triable. If the party had demanded trial by jury for only some of the issues, any other party within 10 days after service of the demand or such lesser time as the court may order, may serve a demand for trial by jury of any other or all of the issues of fact in the action.
*(d) Waiver.* The failure of a party to serve and file a demand as required by this rule constitutes a waiver by the party of trial by jury. A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties.
*(e) Admiralty and Maritime Claims.* These rules shall not be construed to create a right to trial by jury of issues in an admiralty or maritime claim within the meaning of Rule 9(h).

20. Even if the defendants were to argue that the May 20, 2004 Answer filed only in Adversary 03–203A constituted the Answer for Adversary 04–0386A, that argument would fail. The 03–203A Answer did not contain the 04–0386A caption with the style of the case or case number, and does not name all of the 04–0386A adversary defendants in the Answer. Furthermore, even if the Answer were allowed to stand for a proper jury demand for both adversaries, the court would nonetheless find that defendants waived all rights to a trial by jury.

21. As properly noted by the plaintiff, many of the issues being decided involve equitable issues of substantive consolidation, property of the estate and accounting of monies for which no jury trial right attaches.

22. The court is allowing the very late-filed Answer to allow the merits of the case decide this controversy. Given the extensive stall, delay and harassment tactics that have been utilized by Dr. Robert Holcomb and his related entities, the court does not want this case decided based on procedural inadequacies of the defense. Instead, the court decides these cases based strictly on the merits of the claim.

conference was then held just four days after the Answer was filed. The Pretrial Order, entered on June 17, 2004 provided as follows:

### FINAL DISPOSITION

All parties consent to final disposition of this contested matter by the Bankruptcy Court.

Subsequently, on August 23, 2004, the parties filed an Agreed Amended Pretrial Order that added several agreed upon issues. Also included was an issue asserted by the Defendants, but not agreed to by the debtor:

Whether the reference should be withdrawn and the proceedings should be transferred to the United State District Court for the Middle District of Tennessee for trial before a jury.

The Amended Agreed Pretrial Order provides that in "all other respects, the Pretrial Order continues in effect."

Thus, as of August 23, 2004, the defendants had both agreed to final disposition in the Bankruptcy Court, and asserted their rights to withdraw the reference for a jury trial in the United States District Court. Despite these contrary positions, the defendants did not, and have not, filed a motion to withdraw the reference. Accordingly, this court finds that any right to a jury trial is waived. *Stainer v. Latimer (In re Latimer)*, 918 F.2d 136 (10th Cir. 1990), *cert. denied*, 502 U.S. 863, 112 S.Ct. 186, 116 L.Ed.2d 147 (1991) (court finding a defendant's request for a jury trial was properly denied where defendants never

requested withdrawal of the reference); *See In re Chemetco, Inc.*, 308 B.R. 339 (Bankr.S.D.Ill.2004) (distinguishing *Latimer* because in *Latimer* no motion was ever filed, but in *Chemetco*, the court had discretion on timeliness issue when motion to withdraw reference was filed only seven days after the jury demand); *Consolidated Industries Corp. v. Welbilt Holding Co.*, 254 B.R. 237, 241 (N.D.Ind.2000) (holding with or without a local rule so requiring, failure to file motion to withdraw the reference when jury demanded was a waiver of right to jury trial).

28 U.S.C. § 157 requires that a party file a "timely motion" for "cause shown" to withdraw the reference. The reason for the timeliness requirement is to prevent parties from forum shopping, *stalling*, or otherwise engaging in *obstructionist* tactics. *In Matter of Lissner Corp.*, 115 B.R. 604, 608–612 (N.D.Ill.1990); *In re Giorgio*, 50 B.R. 327, 328–329 (D.R.I.1985); *See also, In re White Motor Corp.*, 42 B.R. 693 (N.D.Ohio 1984). In this case, the Defendants' own contested issue in the *Agreed Amended Pretrial Statement* placed the burden upon the defendants to seek withdrawal of the reference to obtain a jury trial. The defendants' failure to file a *timely* motion would result in waiver of their jury trial rights. So certainly, their failure to file any such motion at all, results in the same waiver. Where a case has been set for a bench trial without objection of either party, courts have also found waiver. *See In re Casa Nova Lansing, Inc.*, 146 B.R. 370, 373 (Bankr. W.D.Mich.1992).[23]

---

**23.** On the first morning of the trial, counsel for the defendants feigned his surprise that no jury was present. The court finds that his surprise was completely disingenuous because, his local counsel had called the week prior to trial checking to see if this was a bench trial. Local counsel is well aware that the Bankruptcy Court does not have a ready jury pool, and must make prior arrangements with the District Court to bring a jury over from across the street, and accommodate a jury during a trial. In addition, counsel had never sought withdrawal of the reference. He had made absolutely no pretrial filings indicating that he "believed" a jury would be present. Counsel never sought relief from the

In adversary 03–203A, the instances of waiver are overwhelming: (1) the defendants' history of stall and delay tactics during numerous contested discovery motions tend to show their jury demand without a motion seeking to withdraw the reference was nothing more than obstructionist tactics; (2) their failure to ever seek withdrawal of the reference and then show up at trial feigning surprise; (3) their failure to seek amendment of the pretrial order that provided for their consent to the bankruptcy court's jurisdiction; (4) the defendants' jury demand in an extremely late-filed Answer; and (5) the lack of sincerity on the part of Dr. Robert R. Holcomb and his numerous legal counsel in dealing with both the debtor and this court. The court finds that defendants waived any right to a trial by jury, and by the explicit terms of the pretrial order consented to have this court finally determine these matters.

In adversary 04–0386A, no jury demand was ever made. In the remote instance that the jury demand in the 04–0203A Answer was somehow meant to be or somehow is construed as a proper jury demand, the court nonetheless finds waiver in that instance as well. The first mention of a jury is buried on page 15 of a Joint Pretrial Statement. The Pretrial Order entered in adversary 04–0386A on June 17, 2004 lists as an issue: "On which, if any, are the Defendants entitled to a jury trial?" The Pretrial Order was Amended by Agreement on August 23, 2004 to include the 03–203A issues for simultaneous trial. However, no mention is ever made of a jury trial right again by the defendants until counsel's feigned surprise on day one of the five-day trial.

Because no jury demand was made in adversary proceeding 04–0386A, the court finds no right to a jury trial in this proceeding. Furthermore, even if a jury demand was somehow properly asserted through the 03–203A Answer, the court finds such demand was waived for all of the reasons stated above. Furthermore, Dr. Robert R. Holcomb, a named defendant, has filed a proof of claim against the debtor thereby submitting himself to the bankruptcy claims process and waiving any jury trial rights. *Langenkamp v. Culp*, 498 U.S. 42, 44, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990), (holding that a party filing a proof of claim is deemed to have waived a jury trial by placing the dispute into the arena of "public rights.").[24]

---

pretrial order and *agreed* amended pretrial order indicating that he had consented to final disposition by the bankruptcy court. Furthermore, no consent to a jury trial had been given by the debtor pursuant to Federal Rule of Bankruptcy Procedure 9015. With seemingly competent trial counsel, the court can only conclude that the feigned surprise of no jury was a further attempt to delay the inevitable day of justice particularly since it was accompanied by a motion for recusal that would have required a continuance of months.

**24.** Dr. Robert R. Holcomb's proof of claim was filed on January 17, 2002 and claims wages owed in the amount of $493,000.00. Dr. Holcomb seeks amounts due under his Employment Agreement, and in addition seeks damages for violation of a "Japanese patent." The United States Supreme Court in *Langenkamp* held as follows:

In *Granfinanciera* we recognized that by filing a claim against a bankruptcy estate the creditor triggers the process of "allowance and disallowance of claims," thereby subjecting himself to the bankruptcy court's equitable power. If the creditor is met, in turn, with a preference action from the trustee, that action becomes part of the claims-allowance process which is triable only in equity. In other words, the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's equity jurisdiction. As such, there is no Seventh Amendment right to a jury trial.

Thus, the court finds no jury trial right, and if a jury was properly demanded, such was waived in both adversary proceedings. The court finds that the plaintiff and defendants consented to this court's final disposition of all issues in adversary proceeding 03–203A and 04–0386A.

Accordingly, the court will address the substantive issues of these adversary proceedings. As to the substantive issues, the plaintiff asks for (1) a declaratory judgment under the Employment Agreement and/or Assignment that it is the rightful owner of the patents at issue; and (2) a monetary judgment against Dr. Holcomb and his related entities for alleged fraudulent conveyances or alternatively for substantive consolidation of all of the related companies.[25]

---

*Langenkamp*, 498 U.S. at 44–45, 111 S.Ct. 330 (citations omitted). Thus, Dr. Holcomb's proof of claim acts as a further waiver of any Seventh Amendment jury trial right.

**25.** Although the pretrial order sets forth issues relating to an injunction against further infringement of the debtor's property, attorney fees, exemplary damages, and prejudgment interest, neither party has addressed issues relating to attorney fees, prejudgment interest and exemplary damages in any recent pretrial pleadings or in the post-trial pleadings. As to the injunctive relief request, the court finds that a declaratory judgment that the property at issue belongs to HHCS is enough to settle these matters. Any injunction without proof of imminent violation of this court's declaration would be premature, and the court therefore dismisses any request for injunctive relief without prejudice to raise those issues in some later proceeding should the issues become ripe.

The court finds that it was incumbent upon the plaintiff to prove entitlement to exemplary damages, and because that burden was not met, the court declines to award exemplary damages.

As to attorney fees, it was also incumbent upon HHCS to show a basis for its attorney fees. Under the "American Rule," unless otherwise specified in a contract or statute, parties to litigation must bear their own attorney's fees. *See Johnson v. Righetti (In re Johnson)*, 756 F.2d 738, 741 (9th Cir.1985) *cert. denied*, 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985) (applying American rule to § 362). The last and only place HHCS addressed its alleged right to attorney fees was in the pretrial statement filed in June of 2003 stating only that HHCS is entitled to attorney fees. In reviewing the record, the court found no contractual attorney fee provision in the Employment Agreement or the Assignment. The only reference to attorney fees found in the Operating Agreement requires each party to pay pro rata shares of the arbitration expenses in the event of a dispute, but specifically excludes attorney fees incurred for each party's own benefit. The court finds that HHCS has failed to show its entitlement to attorney fees in this action.

Finally, as to prejudgment interest, the court finds prejudgment interest is appropriate. An award of prejudgment interest is within the discretion of the Bankruptcy Court. *In re Montgomery*, 136 B.R. 727, 729–730 (M.D.Tenn., 1992). The purpose of awarding interest is to compensate the wronged person for deprivation of the monetary value of the loss from the time of the loss to the payment of the money judgment. *Turner v. Japan Lines, Ltd.*, 702 F.2d 752 (9th Cir.1983). Preference actions are not exempt from the imposition of prejudgment interest and there is a long history of judicial support for awards of prejudgment interest in preference actions. *E.g., Kaufman v. Tredway*, 195 U.S. 271, 273, 25 S.Ct. 33, 34, 49 L.Ed. 190 (1904); *Foreman Industries, Inc. v. Broadway Sand & Gravel*, 59 B.R. 145, 155 (Bankr.S.D.Ohio 1986); *3 Collier on Bankruptcy # 60.63[1]*, at 1129 (14th ed.1977).

Generally, interest should be paid from the time a demand was made for a return of the property, or, in the case where no demand was made, from the date the complaint was filed to the entry of the judgment. *In re Southern Indus. Banking Corp.* 87 B.R. 518, 521–522 (Bankr.E.D.Tenn.1988).

The purpose of allowing prejudgment interest is compensatory, not punitive; such interest is granted to make the prevailing party whole. *See In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 849 (7th Cir.1997). Not only must the award of prejudgment interest be compensatory, it is also within the court's discretion to determine if such award is equitable. *Id.* ("Discretion must be exercised according to law, which means that prejudg-

## B. The Declaratory Judgment Action

In the declaratory judgment action, the plaintiff seeks a ruling that certain intellectual property is owned by HHCS. The debtor asserts that the following patents, patent applications, or otherwise described intellectual property are not property of any of the named defendants, but belong to HHCS by virtue of the Employment Agreement signed by Dr. Holcomb and/or the February 20, 1996 Assignment signed by Dr. Holcomb:

| Exhibit Number | Patent of Patent Application No. | Filing Date of Application or Provisional Application or Claimed Priority Date | Title |
|---|---|---|---|
| 103 | 6,461,288 | 09/10/96 | Method and Apparatus for Altering Charge Distribution Upon Living Membranes with Functional Stabilization of the Membrane Physical Electrical Integrity |
| 104 | 6,741,889 | 08/22/00 | Electronic Apparatus and Method for Treating Human Pain Through Application of an Electrical Stimulus in Combination with Application of a Magnetic Field |
| 105 | 6,703,066 | 03/13/97 | Flavor Enhancer Composition Containing Colloidal Silica and Method for Its Preparation and Use |
| 106* | 6,280,376 | 04/26/99 | Electromagnetic Therapeutic Treatment Device and Methods of Using Same |
| 107* | 6,205,356 | 04/26/99 | Electronic Apparatus and Method for Treating Human Pain Through Application of an Electrical Stimulus in Combination with Application of a Magnetic Field |
| 108 | App No. 10/473,871 Publ. No. U.S. 2004/0154220 | 03/28/01 | Reducing Sulfur Dioxide Emissions from Coal Combustion |
| 109 | 5,658,573 | 06/07/95 | Method of Generating an Aqueous Suspension of Colloidal Silica |
| 110 | 5,607,667 | 06/11/93 | Body Care Compositions, Method of Using Same, and Method of Generating a Relatively Stable Aqueous Suspension of Colloidal Silica for Use Therein |
| 111 | 5,599,531 | 08/27/93 | Hair Care, Hydrating, Coloring and Perming Compositions and Methods |
| 112 | 5,537,363 | 06/07/95 | Apparatus for Generating a Relatively Stable Aqueous Suspension of Colloidal Silica |

ment interest should be awarded unless there is a sound reason not to do so."). "Discretion is not, however, authorization to decide who deserves the money more." *Id.* In other words, prejudgment interest is "simply an ingredient of full compensation," and should not be considered a windfall. *In re P.A. Bergner & Co.*, 140 F.3d 1111, 1123 (7th Cir.), *cert. denied*, 525 U.S. 964, 119 S.Ct. 409, 142 L.Ed.2d 332 (1998).

In this case, the court finds that prejudgment interest is necessary to fully compensate HHCS and finds that such is awarded to the plaintiff on the monetary judgment amount as set forth more fully below. Prejudgment interest is to be paid from the time of the filing of the adversary proceeding until entry of the judgment, and shall be paid at the federal rate. *28 U.S.C. § 1961.*

| 113 | 4,888,113 | 12/29/88 | Magnetic Water Treatment Device |
|---|---|---|---|
| 114 | US 2001/0027219 App. No. 09/749,243 | 01/08/01 | Description of an Inorganic Polymer "Electret" in a Colloidal State Along with the Method for Generating and Applications |
| 115* | US 2001/0041917 App. No. 09/756,474 | 09/10/96 | Placebo Apparatus for Continuous Pulse, Non–Modulated Non–Burst Nerve Stimulator |
| 116* | US 2003/0092960 App. No. 10/265,921 | 09/10/96 | Method and Apparatus for Altering the Charge Distribution on Living Membranes with Functional Stabilization of the Membrane Physical Electrical Integrity |
| 117 | WO 02/079356 | 03/28/01 | Reducing Sulfur Dioxide Emissions from Coal Combustion |
| 118 | US 2004/0166246 App. No. 10/473,873 | 03/29/02 | Process and Composition for Treating Wood |
| 119* | 6,776,753 | 06/28/99 | Method and Apparatus for Treating Pain with Therapeutic Magnets |
| 120* | 5,312,321 | 05/11/92 | Method and Apparatus for Suppressing Neuron Action Potential Firings |
| 121 | 6,042,531 | 06/19/96 | Electromagnetic Therapeutic Treatment Device and Methods for Using Same |
| 122 | 5,941,902 | 06/19/96 | Continuous Pulse, Non–Modulated Non–Burst Mode Nerve Stimulator and Method of Applying Same |
| 124 | Provisional Patent Application | 01/01 07/01 12/00 03/01 (priority) | Not Disclosed for protective purposes but generally referred to as IPE technology as applied to green house gases |
| 125 | Unnumbered Provisional Patent Application | 06/98 06/97 12/97 12/97 (priority) | Not Disclosed for protective purposes but generally referred to as IPE technology as applied to coal emissions |
| 126 | Unnumbered Provisional Patent Application | 06/98 06/97 12/97 12/97 (priority) | Not Disclosed for protective purposes but generally referred to as IPE technology as applied to wood preservative |
| 127 | WO 02/079356 | 03/28/01 (priority) | Reducing Sulfur Dioxide Emissions From Coal Combustion |
| 128 | WO 02/078865 App. No. PCT/ US02/10128 | 03/30/01 (priority) | Apparatus and Process for the Synthesis and Application and Uses of an Inorganic Polymer Based Wood Preservative |
| 129 | US 09/749,243 | 12/26/00 (filing) 06/05/98 05/13/98 12/10/97 12/08/97 06/05/97 (priority) | Description of an Inorganic Polymer "Electret" in a Colloidal State Along with the Method of Generating and Apparatus |
| 130 | WO 97/49473 | 06/27/96 (priority) 06/27/97 (filing) | Water Treatment Device and Method |

| 131 | Not Disclosed for Protective Purposes | 10/02 (priority) | Not disclosed for protective purposes, but generally referred to a power generator |
|-----|----------------------------------------|------------------|-----------------------------------------------------------------------------------|
| 132 | Not Disclosed for Protective Purposes | Not Disclosed for Protective Purposes | Not Disclosed for protective purposes but generally referred to as IPE technology as applied to fuel additive |

The Exhibit Numbers marked with an * and in *bold type face* are not disputed as being owned by the plaintiff and include Exhibit Numbers 105, 106, 115, 116, 119, and 120.

### 1. The Employment Agreement

█ As noted above, the Employment Agreement provides that Dr. Holcomb was hired as HHCS's Chief Scientific Officer and had responsibility for all scientific, regulatory, patent and technology matters for HHCS, including development, enhancement and application of the "Technology." Technology was a defined term in the Exhibit A to the Employment Agreement and provided as follows:

Technology is defined in terms of the current knowledge and parameters, as (a) device, (b) mechanism, and (c) effect as follows:

(a) In 1997, Robert R. Holcomb began formal research on a quadrapolar magnetic device, MagnaBloc, for the control of acute and chronic pain, said device as being described in U.S. Patent ⸻ issued ⸻.

(b) This static quadrapolar magnetic array stabilizes the membrane, alters neuronal firing, and reduces the transmission and register of electro chemical signals to the brain.

(c) The effect of this alteration is the mitigation or physiological response to pain signal transmission as manifested by reduced perception, reduced trauma and accelerated healing.

The original MagnaBloc device reduces C-fiber firing; when coupled with Alternating Current and Direct Current, the range of treatment is greatly expanded (see initial patent).

Exhibit A to Employment Agreement. Dr. Holcomb argues that his only duties were with respect to this Technology as defined in the Employment Agreement and that Dr. Holcomb's employment was limited to only medical issues stemming from the defined "Technology" term.

The court disagrees. The Employment Agreement is clear on its face, that development and enhancement of the Technology is *included* among his responsibilities for "all scientific, regulatory, patent and technology matters." To further support this clear and unambiguous statement, the parties included "Exhibit B" to the Employment Agreement which provides Dr. Holcomb additional compensation for future inventions. That part of the Employment Agreement provides:

As additional compensation, it is hereby agreed that the Employee [Dr. Holcomb] will receive $500,000 or 10% of sales, whichever is less as further inducement for the future invention and commercialization of devices based on the *Gateway Theory* control mechanism, magnetic fields, and AC/DC current . . .

HHCS contends that Dr. Holcomb's Employment Agreement, signed on October 9, 1995 and terminated post-petition in August 2001, requires that all inventions and future inventions developed during his employment belong to HHCS under the Employment Agreement, and his duty of loyalty to HHCS. Dr. Holcomb applied for patents or filed provisional patent applica-

tions for inventions found at Exhibits 103–108, 114–117, 119, 121–130. All of these were filed during his employment or cite priority to a patent application filed during his employment. According to HHCS, pursuant to the Employment Agreement, Dr. Holcomb had a duty of loyalty to the debtor to continue the development of intellectual property, including the property covered by the Assignment.

Dr. Holcomb counters that the Employment Agreement specifically permits him to engage in "any different or additional outside business activities." Dr. Holcomb is correct, but the contract is also clear that the other activities cannot conflict with the business of HHCS *and* are subject to disclosure to and approval by HHCS. Dr. Holcomb is free, for example, to continue his medical practice, but he cannot engage in another enterprise that conflicts with his duties at HHCS.

The interpretation of a written contract is a matter of law, and thus, no presumption of correctness in its interpretation exists. *NSA DBA Benefit Plan, v. Connecticut Gen. Life Ins. Co.*, 968 S.W.2d 791 (Tenn.Ct.App.1997). The cardinal rule in the construction of contracts is to ascertain the intent of the parties. *West v. Laminite Plastics Mfg. Co.*, 674 S.W.2d 310 (Tenn.Ct.App.1984). If the contract is plain and unambiguous, the meaning thereof is a question of law, and it is the court's function to interpret the contract as written according to its plain terms. *Petty v. Sloan*, 197 Tenn. 630, 277 S.W.2d 355 (1955). The language used in a contract must be taken and understood in its plain, ordinary, and popular sense. *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578 (Tenn.1975).

In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. *Ballard v. North American Life & Casualty Co.*, 667 S.W.2d 79 (Tenn.Ct.App.1983). If the language of a written instrument is unambiguous, the court must interpret it as written rather than according to the unexpressed intention of one of the parties. *Sutton v. First Nat. Bank of Crossville*, 620 S.W.2d 526 (Tenn.Ct.App.1981). Courts cannot make contracts for parties, but can only enforce the contract which the parties themselves have made. *McKee v. Continental Ins. Co.*, 191 Tenn. 413, 234 S.W.2d 830 (1950).

The court finds that the Employment Agreement is clear and unambiguous, and its interpretation is within the court's province as a matter of law. The Agreement hires Dr. Holcomb as HHCS's Chief Scientific Officer to handle *all* scientific and technology matters for HHCS, *including* development of the defined "Technology," as well as all other scientific and technological matters.[26] Furthermore, the parties clearly and unambiguously set out additional incentive compensation for Dr. Holcomb's development and commercialization of *future* inventions relating to, among other things, magnetic fields.

The contract is also clear that Dr. Holcomb is free to engage in other activities, as long as such activities are not in conflict with HHCS *and* such have been disclosed to and approved by HHCS. Under this plain meaning interpretation, the court finds that the patents or filed provisional patent applications for inventions found at Exhibits 103–108, 114–117, 119, 121–130 filed during Dr. Holcomb's employment or citing priority to a patent application filed during his employment, fall under the

26. "Scientific" is defined as "of, relating to, or exhibiting methods or principles of science" in Merriam–Webster's online dictionary and is an extremely broad term. *See www.mw.com/cgi-bin/dictionary*.

plain terms of the Employment Agreement as a matter of law.

### 2. The Assignment

■ Not only does HHCS claim ownership under the Employment Agreement, but also under the February 20, 1996 Assignment. As set forth above, the Assignment acknowledges Dr. Holcomb's previous assignment of the "Magna Bloc patent and other patent applications to HHCS." The Assignment then specifically, and clearly provides:

> The parties desire to have [Dr.] Holcomb by this Assignment assign to HHCS any and all of the Inventions which are not included in the patent and patent application previously assigned by Holcomb to HHCS.

Dr. Holcomb agrees to assign to HHCS all right, title, and interest in and to the Inventions in Exhibit A, "and any applications for U.S. Letters Patent relating hereto, and all divisions, continuations, continuations-in-part and reissues thereof, and any and all Letters Patent of the United States and foreign countries which may be granted therefore." Exhibit A then defines what Dr. Holcomb assigns to HHCS by setting forth the property owned individually by him or HHCS that is covered by the Assignment. The property is defined as "preexisting intellectual property *including* inventions, devices, products, procedures, processes, treatments, techniques, applications *and* know how directly or indirectly relating thereto or there from *including* present and pending patents and patent applications." (Emphasis Added).

Dr. Holcomb argues that the Assignment and Exhibit A were intended for medically-related intellectual property. Item 13 of the Assignment, assigning "methodologies for generating and manipulating the distribution of charged parti-cles and surface charges," was, according to the defendants, intended to refer to medically related inventions only. This is shown, the defendants argue, by the contract itself, the naming of the debtor, Holcomb HEALTHCARE Services, LLC, and Dr. Holcomb's testimony at trial.

The debtor contends, however, that the Assignment, like the Employment Agreement, is clear and unambiguous, and a plain meaning interpretation includes the patents and patent applications at issue. More specifically, patent exhibit numbers 112, 119, 120, 110, 111, and 113 were pre-existing intellectual property covered by the Assignment. The remaining patents, patent applications or otherwise named intellectual property fall under the Assignment's broad grant of everything "directly or indirectly" relating to the assigned property, including know how.

The court finds that like the Employment Agreement, the Assignment is clear and unambiguous and subject to interpretation as a matter of law. The court finds, therefore, as a matter of law, that patent exhibit numbers 112, 119, 120, 110, 111, and 113 were pre-existing intellectual property covered by the Assignment. The remaining patents, patent applications or otherwise named intellectual property found at Exhibits 103–109, 112, 115–118, 121–129, 131, and 132, fall under the Assignment's broad grant of everything "directly or indirectly" relating to the assigned property, including know how and therefore belong to HHCS.

### 3. If the Employment Agreement and Assignment are not Subject to Interpretation as a Matter of Law, the Court Nonetheless Finds, Based on the Proof Presented, that HHCS is the Rightful Owner of the Property at Issue.

■ The court has found that the Employment Agreement and Assignment are

clear and unambiguous and therefore can be interpreted as a matter of law. In the unlikely event that the court is somehow mistaken, and the terms of either the Employment Agreement or the Assignment are not plain, the court nonetheless finds that the credible testimony of the debtor's witnesses, the documentary evidence offered by HHCS, the self-serving testimony of Dr. Holcomb, and the less credible testimony of the defendants' witnesses, more than supports the court's findings as to the meaning of the Employment Agreement and Assignment.[27]

#### a. Testimony of the Fact Witnesses

Supporting the inclusion of the disputed intellectual property among HHCS's property under the Employment Agreement and/or the Assignment was the credible testimony of Thomas Buckner and John Townsend. Mr. Buckner, at the time an HHCS Board Member, and attorney for HHCS, drafted both the Employment Agreement and the Assignment. Buckner testified that Dr. Holcomb's and Mr. Townsend's handwritten notes (Exhibit 4) were eventually incorporated into Exhibit A of the Assignment and reflected the parties intent to include Dr. Holcomb's individually held proprietary rights, "devices which are designed to generate pre-dictably charged particles," and "[m]ethodologies for generating and manipulating the distribution of charged particles and surface charges." Mr. Townsend's testimony was consistent, and equally credible.

The defendants' contention that in the Employment Agreement and Assignment the parties intended a more limited scope relating only to medical technology was not supported by the evidence. Based on the reliable and credible testimony of Mr. Buckner and Mr. Townsend, the court finds that the parties intended the broader interpretation urged by HHCS. This finding is based equally on the reliable and believable testimony of Mr. Buckner and Mr. Townsend as well as the inconsistent, unreliable and at times untruthful testimony of Dr. Holcomb.

The inconsistencies in Dr. Holcomb's testimony were overwhelming. His answers were self-serving, at best evasive and at worst untruthful. While Dr. Holcomb was acting as the self-appointed Chief Manager of HHCS, and was firmly in control of HHCS and the AmWay royalty payments, he openly treated non-medical intellectual property (commonly referred to by Dr. Holcomb and others associated with HHCS as "IPE" technology),[28] as an asset of HHCS. For example,

---

**27.** The defendants did not offer a single independent witness. All of the witnesses, including the defendants' expert witnesses, have some business or professional relationship or financial interest that is allied with the defendants. The expert witnesses: (1) Dr. Stefan Engstrom, is a co-worker of Dr. Holcomb's in the Vanderbilt Neurology Department, and was the least entangled; (2) Dr. Michael McLean is also in the Vanderbilt Neurology Department with Dr. Holcomb, and has known Dr. Holcomb since at least 1987. Dr. McLean has also worked under grants funded by Dr. Holcomb controlled entities which terminated after new HHCS management was installed; (3) Robert Mallinckrodt has served as patent counsel for Dr. Holcomb or his compa-

nies, and Mallinckrodt's law firm is listed as patent counsel on Exhibits 105, 108, 110, 111, and 112. Even the defendants' fact witnesses were linked to Dr. Holcomb and/or his entities: (1) Julia Hubbard is, among other things, Dr. Holcomb's long-time business associate, and current CFO of Demeter Systems, LLC; (2) Dr. Harry Jacobson, another Vanderbilt connection of Dr. Holcomb's with financial investments of at least $200,000 in one of Dr. Holcomb's entities, Aether Power, LLC; and (3) Dr. Holcomb.

**28.** The term "IPE" was used regularly by Dr. Holcomb and is used prolifically throughout the testimony and documentary evidence. "IPE" is the acronym for "inorganic polymer

Dr. Michael McLean, with Dr. Holcomb's approval, gave a presentation to Parke–Davis Pharmaceuticals, on behalf of HHCS, touting the IPE technology as belonging to HHCS to potentially reformulate an existing Parke Davis drug.[29] HHCS communicated with its insurance agent describing certain inventions based on the IPE technology.[30] There are numerous examples throughout the record of other such instances, including but certainly not limited to, Exhibit 19, showing a Developmental History of Patent Status and referring to IPE.

Although Dr. Holcomb freely used the IPE technology as an HHCS asset while in control of HHCS, he attempted to secret those same technologies away upon losing control of HHCS when Mr. Townsend foreclosed upon his HHCS interests. Demeter, organized by Dr. Holcomb post-petition, and its operating companies, now lay claim to this same IPE technology.

The court finds further support for its interpretation of the Employment Agreement and Assignment in the testimony of former employee and investor in HHCS, Dr. Brad Worthington. Dr. Worthington, as did Mr. Buckner and Mr. Townsend, testified that Dr. Holcomb had repeatedly assured him that HHCS owned all of the "charged particle technology" which he understood to include the IPE technology. This testimony was also consistent with the testimony of former office manager, Kimberly Lewis. Ms. Lewis explained that on more than one occasion she had overheard Dr. Holcomb complain that he kept his technologies in different companies because he wanted to keep others, specifically mentioning Mr. Townsend, from taking his technologies.

### b. Testimony of the Expert Witnesses

In addition to the fact witnesses, both parties also presented expert witnesses to assist the court in sorting through the scientific proof for purposes of determining whether or not a specific scientific technology fell under the Employment Agreement and/or Assignment. HHCS offered the testimony of Dr. William Far-

---

electret." At trial Dr. Holcomb testified that he disliked the term and that he did not use it. He also testified that it had no specific definition, and therefore he could not define its meaning. Even in light of the extensive use of the term in the evidence and testimony, Dr. Holcomb denied "IPE" had any real significance. When asked by his own counsel what "IPE" meant, in his evasive way, Dr. Holcomb answered, "I do not know." He later explained: "That's a slang term that developed out of a conference I had with Teledyne Corporation at one point who was an engineer and said well this is an inorganic polymer electret. So everybody started calling what I was doing IPE. And I wished they had never started calling it that, because it doesn't' mean anything. It's a non-specific, non-art term. . . ."

**29.** Although Dr. Holcomb testified that he performed most of the research on this specif-

ic project, Dr. McLean made the presentation to Parke Davis. Dr. McLean testified that it was his understanding that he was making the presentation on behalf of HHCS.

**30.** The facsimile is sent from Julia Hubbard to HHCS's insurance agent, and states that HHCS has only "one product, (MagnaBloc™) that is being marketed. We have approximately four new products that we expect to hit the market by the first of 2000. Those are engine coolants and additives, oral care and cosmetics. We do not plan on manufacturing these products but we probably manufacture IPE (one of the technologies) for other manufacturers."

Dr. Holcomb testified unconvincingly that he did not know why Dr. McLean had used HHCS's name, and the communication to the insurance agent was for HHCS and Holcomb Companies even though it was sent on HHCS letterhead.

one[31] and patent attorney Wendy Buskop.[32]

Dr. Farone testified that Dr. Holcomb's inventions use the concept that a specific arrangement of the magnetic field can be used to cause charges to be manipulated in very specific ways. Dr. Farone's opinion was that this is the basic concept behind all of Dr. Holcomb's inventions. Dr. Farone testified that in his professional opinion, the patents and patent application that he reviewed, all use alteration of charged particle distribution, and were within the scope of the Assignment because they were at the very least, the result of the same "know how" assigned to the debtor.[33]

The debtor also called Wendy Buskop. Ms. Buskop testified that based upon her extensive business experience in dealing with employment agreements and assignments, and her legal expertise, that it was her opinion that both the Employment Agreement and Assignment were expansively drawn. It was her expert opinion that the patents, patent applications and provisional patent applications she reviewed all fell within the broadly written Employment Agreement and/or Assignment.[34]

The defendants relied upon the expert testimony of three witnesses: (1) Dr. Stefan Engstrom,[35] Dr. Michael McLean,[36] and (3) patent attorney Robert Mallinckrodt.[37] Dr. Engstrom did not offer any

31. Dr. Farone is currently President and CEO of Applied Power Concepts, Inc., a company in Anaheim, California, developing chemical technology and biotechnology. Dr. Farone has bachelor (1961) and master (1962) degrees in chemistry, and a doctorate degree in physical chemistry (1965). Dr. Farone's past employment includes work as a physicist researching electromagnetic radiation at the White Sands Missile Range in New Mexico, teaching at the collegiate level, work at Lever Brothers, PVO International, and Phillip Morris. Dr. Farone has experience in developing patent protection strategies and had responsibility for all patent holdings while at Phillip Morris. Dr. Farone has more than 40 years experience working with patent and licensing agreements.

32. Wendy Buskop is currently the Managing Patent Attorney at the Buskop Law Group in Houston, Texas, a boutique firm specializing in patent work. Ms. Buskop has more than 20 years experience in private and corporate practice. Ms. Buskop has reviewed and written thousands of patents and prosecuted patents before the United States Patent and Trademark Office. Her former employment with Dow Chemical and Shell Oil Company has provided her with extensive experience in patenting and protection of inventions of colloids. She has been recognized nationally for her expertise. She holds a B.A. with a focus in chemistry and MA from Wesleyan, and a J.D. from Franklin Pierce Law Center. She

has also completed additional course work in chemistry.

33. Dr. Farone specifically excluded Exhibit 131 from his finding, and it was his opinion that this particular technology did not use charged particle technology.

34. It was Ms. Buskop's opinion that Exhibit 130 did not fall under the Assignment, but the debtor nonetheless argues that such was covered by the Employment Agreement.

35. Dr. Stefan Engstrom is an Associate Professor in the Neurology Department at Vanderbilt. He holds a M.Sc. degree in Engineering Physics and a doctorate in theoretical physics. Dr. Engstrom testified as an expert in the field of bioelectromagnetics (therapeutic inventions).

36. Dr. Michael McLean is a scientist in the Vanderbilt Neurology Department. Dr. McLean is an Associate Professor and has extensive experience with neuromagnetics, the MagnaBloc™, and therapeutic devices using magnets. He holds a bachelor's degree in biology (1970), a doctorate in physiology (1976), and an MD degree (1978). Dr. McLean worked under grants funded by Dr. Holcomb controlled entities, funding of which was terminated by the Townsend-controlled HHCS management post-petition.

37. Robert Mallinckrodt is an intellectual property attorney. He holds a B.S. in electri-

opinion concerning which of the technological inventions fell under the Employment Agreement or Assignment. Instead, Dr. Engstrom took issue with the use of a specific scientific formula (the Lorenz equation) used by Dr. Farone as an example to help the court understand how Dr. Holcomb's inventions were scientifically related. Dr. Michael McLean, testifying as a neuromagnetics expert, disagreed with Dr. Farone and Ms. Buskop's conclusions uniting Dr. Holcomb's technologies. Specifically, Dr. McLean opined that the MagnaBloc™ technology is not required for the other patents, and there is no such thing as "charged particle technology."

Finally, the defendants called patent attorney Robert Mallinckrodt. Mr. Mallinckrodt opined that the patents, patent applications and provisional patent applications created by Dr. Holcomb are different inventions from those medical devices and patents which are the subject of the Assignment, and therefore are not property of HHCS. He testified that the Assignment covered only medical devices, and while many of the inventions include the use of magnets or magnetic fields, the inventions are otherwise unrelated and not covered by the Assignment. Mr. Mallinckrodt reiterated that it was his opinion that the Employment Agreement, likewise, covered only medically related inventions.

### c. Conclusions as to Credibility of All Witnesses

The determination as to credibility of witnesses is within the province of the trier of fact, in this case, the bankruptcy judge, and the call is not even a close one. The HHCS fact witnesses provided clear, consistent, and largely independent assessments. Dr. Holcomb, on the other hand, was evasive, combative, and at time directly untruthful. His testimony is full of reversals, inconsistencies, and intentionally non-responsive answers. Likewise, as to the expert witnesses, the court has the discretion to accept the opinion of one expert over that of another expert. See *Johnson v. Midwesco, Inc.*, 801 S.W.2d 804 (Tenn.1990); *Kellerman v. Food Lion, Inc.*, 929 S.W.2d 333 (Tenn.1996). The acceptance of one expert's testimony over another is based upon the perception of the credibility of one expert over that of other experts who testify. The assessment of credibility of witnesses is reserved exclusively for the trial judge when the testimony is given by witnesses in person at trial. See *Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315 (Tenn.1987). In this case, the court finds the credibility of Ms. Buskop and Dr. Farone trumps the credibility of Dr. Engstrom, Dr. McLean, and Mr. Mallinckrodt. The court found the former's testimony to be thoughtful, convincing and credible. Not only did the court find Dr. Farone and Ms. Buskop's testimony more helpful and believable, but the court found no hidden motivation in espousing their opinions.

Mr. Mallinckrodt's criticism of Ms. Buskop and Dr. Farone was completely unconvincing, inconsistent, contradictory and lacking independence. The court found Ms. Buskop's expertise, her independent testimony, and thorough explanation highly convincing. Likewise, the court finds Dr. Farone was a credible witness. He assisted the court in understanding the basic science involved. Dr. Engstrom took issue with the formula Dr. Farone used as an example to explain the highly technical

---

cal engineering (1969) and a J.D. (1973). He has practiced as a patent attorney for more than 30 years in Salt Lake City, Utah, and has served as patent counsel to Dr. Holcomb and his companies. As noted in a previous footnote, Mr. Mallinckrodt's firm is listed as patent counsel on several of the patents at issue in this case.

issues to the court. The court, however, understood Dr. Farone was not attempting to specifically unite Dr. Holcomb's work under the Lorenz equation, but that Dr. Farone was simply telling the court how the theory helps to explain the technology. The court found Dr. Farone's testimony, in general, more helpful.[38]

The court is not a font of wisdom with the oracular ability to divine that which cannot be shown in concrete terms, but the court is required to consider the evidence and determine that which has been proven by a preponderance of the evidence under the rules of law. If ambiguity does in fact exist in the Employment Agreement and/or the Assignment, the outcome of this case turns on the credibility of the witnesses, and because the court finds the testimony of the debtors' witnesses, taken as a whole, to be more believable than that of the defendants' witnesses, the court concludes that the debtor is the owner of the intellectual property at issues as more particularly described in the chart below[39]:

| Exhibit No. & Patent Number or App. Number | Court's Finding as to Ownership | HHCS Testimony Supporting Ownership | Defendant Testimony Supporting Ownership |
| --- | --- | --- | --- |
| 103 6,461,288 | HHCS OWNS | *Farone:* claimed method for altering the charge distribution on living membranes. Comes from the same body of know how as the Magna-Bloc ™ patent. This is an improvement of the 321 patent. Fits under Assignment. | |
| 104 6,741,889 | HHCS OWNS | NO DISPUTE AS TO OWNERSHIP | NO DISPUTE AS TO OWNERSHIP |
| 105 6,703,066 | HHCS OWNS | *Farone:* It embodies the charged particle technology. It is very clearly the same know how technology and falls under the Assignment. *Buskop:* treating food with an aqueous suspension of charged silica circulated through a magnetic field to produce a charged colloidal particles. | *Mallinckrodt:* Uses a magnetic field but does not require a quadrapolar array. Involves circulation of silica in a generic field and does not fit under the Assignment. |

38. The court does not find that Dr. Engstrom and Dr. McLean lacked credibility. The court does find, however, their testimony criticizing Dr. Farone and Ms. Buskop as unpersuasive, and furthermore, that their testimony lacked the independence of Dr. Farone's and Ms. Buskop's testimony.

39. Ms. Buskop's and Dr. Farone's testimony also touched on whether some of the property at issue was covered by the Employment Agreement. Both of the debtor's experts concluded that those patents, patent applications or provisional patent applications that fell within the scope of Dr. Holcomb's HHCS employment were covered by the Employment Agreement. Mr. Mallinckrodt's testimony on this subject was a bit erratic. He seemed to testify that if the Employment Agreement was limited to medically related technology, then the technology at issue fell outside the Employment Agreement, but if the Employment Agreement was interpreted more broadly by the court, his opinion might change.

| | | | |
|---|---|---|---|
| | | Claim 27 is a method wherein the magnetic field is a quadrapolar magnetic field. Fit under the Assignment, Sections A6 and C13 and Employment Agreement. | |
| 106 6,280,376 | *HHCS OWNS* | NO DISPUTE AS TO OWNERSHIP | NO DISPUTE AS TO OWNERSHIP |
| 107 6,205,356 | *HHCS OWNS* | NO DISPUTE AS TO OWNERSHIP | NO DISPUTE AS TO OWNERSHIP |
| 108 App No. 10/473,871 Publ. No. US 2004/0154 220 | *HHCS OWNS* | *Farone:* the technology described is identical to the technology in the other patents and it is so covered. It embodies charged particle technology. It is covered by the same know how and falls under the Assignment.<br><br>*Buskop:* Contains several claims but a process claim making an aqueous composition using silica derived colloidal particles, and contains an exact match to the language of the Assignment Agreement, Section C13. | *Mallinckrodt:* describes a process for treating coal and does not require the use of magnets. It does not fit under the Assignment. |
| 109 5,658,573 | *HHCS OWNS* | *Farone:* It embodies the same technology as defined in the first claim and it is the same as what was assigned.<br><br>*Buskop:* Generates an aqueous suspension of colloidal silica through a magnetic field. Specifically mentions quadrapolar magnetic array in column 4. Falls under Assignment Section C13. Also indicates that this is a divisional with an existing "brother" patent. | |
| 110 5,607,667 | *HHCS OWNS* | *Farone:* Embodies charged particle technology or know how of charged particle technology.<br><br>*Buskop:* A body care composition of aqueous suspension of colloidal silica particles circulated through a magnetic field by use of a magnetic void. Column 5 shows magnets arranged in a square shape with 4 poles. Fits under Assignment Section A2, letter H. | |

| | | | |
|---|---|---|---|
| 111<br><br>5,599,531 | *HHCS*<br>*OWNS* | *Farone:* Embodies charged particle technology or know how of charged particle technology.<br><br>*Buskop:* Method for treating colloidal silica particles by circulating them through a magnetic field. These are charged particles passed through a magnetic void. Falls under Assignment, in paragraph C13 and also under magnetic void language. | |
| 112<br><br>5,537,363 | *HHCS*<br>*OWNS* | *Farone:* Embodies charged particle technology or know how of charged particle technology.<br><br>*Buskop:* An apparatus for generating a stable aqueous suspension of colloidal silica for creating a magnetic field and mentions the quadrilateral shape of the magnet. Falls under Assignment Section A2 and A3 | |
| 113<br><br>4,888,113 | *HHCS*<br>*OWNS* | *Farone:* The know how that's embodied in this patent is essentially the same know how embodied in the other patents and therefore it is covered under the Assignment.<br><br>*Buskop:* A device for magnetically treating fluid flow through a pipe that utilizes various magnets and Column 10 describes the use of 4 magnets and Figure 8 shows a quadrapolar magnet arrangement. Fits under Assignment Section A1 and A2. | *Mallinckrodt:* does not use a quadrapolar magnetic array which is *sine qua non* of MagnaBloc ™, and does not cite 321 as prior art. |
| 114<br>US<br>2001/0027<br>219<br>App. No.<br>09/749,243 | *HHCS*<br>*OWNS* | *Farone:* This again is virtually identical on the formation of silica, and therefore under the Assignment Agreement.<br><br>*Buskop:* An apparatus for generating an inorganic polymer electret in a colloidal state using a quadrapolar magnetic array in the generator. Falls under the Assignment. | *Mallinckrodt:* Method for generation of a colloidal silica and the broadest claim has nothing to do with the use of magnets. This patent describes a different device and invention than the 321 Patent. Not covered by the Assignment. |
| 115<br>US<br>2001/0041 | *HHCS*<br>*OWNS* | NO DISPUTE AS TO OWNERSHIP | NO DISPUTE AS TO OWNERSHIP |

660

917
App. No.
09/756,474

| | | | |
|---|---|---|---|
| 116<br>US<br>2003/0092<br>960<br>App. No.<br>10/265,921 | *HHCS*<br>*OWNS* | NO DISPUTE AS TO OWN-ERSHIP | NO DISPUTE AS TO OWN-ERSHIP |
| 117<br><br>WO<br>02/079356 | *HHCS*<br>*OWNS* | *Farone:* Contains same charged particle technology and is covered by the Assignment. | |
| 118<br>US<br>2004/0166<br>246<br>App. No.<br>10/473,873 | *HHCS*<br>*OWNS* | *Farone:* Contains same charged particle technology and is covered by the Assignment.<br><br>*Buskop:* This process uses a magnetic generator with four magnets which is noted on page 4 and particularly in Figure 5 and in order to do this process you must have a quadrapolar magnetic array. Fits under Assignment, Section C13. | *Mallinckrodt:* A distinct process for treating wood that involves the IPE of patent exhibit 114, and uses magnets but magnets are in different planes. |
| 119<br><br>6,776,753 | *HHCS*<br>*OWNS* | NO DISPUTE AS TO OWN-ERSHIP | NO DISPUTE AS TO OWN-ERSHIP |
| 120<br><br>5,312,321 | *HHCS*<br>*OWNS* | NO DISPUTE AS TO OWN-ERSHIP | NO DISPUTE AS TO OWN-ERSHIP |
| 121<br><br>6,042,531 | *HHCS*<br>*OWNS* | *Farone:* Contains same charged particle technology defining a slightly different invention and is covered by the Assignment. | |
| 122<br><br>5,941,902 | *HHCS*<br>*OWNS* | *Farone:* | |
| 124<br>Provisional<br>Patent<br>Application<br>01/01<br>07/01<br>12/00<br>03/01<br>(priority) | *HHCS*<br>*OWNS* | *Farone:* It definitely contains the charged particle technology and the know how and is covered by the Assignment.<br><br>*Buskop:* The language of claims 4 and 16 shows it falls under the Assignment. | *Mallinckrodt:* Testified generally as to Exhibits 124–132, that they are distinct because they are various methods of treating fuels, using colloidal silica or manipulating green house gases and have nothing to do with a quadrapolar magnetic array. Claims of various patents reveal all claim different inventions and some use magnets or magnetic fields but they are not related inventions and are NOT covered by the Assignment. |

| | | | |
|---|---|---|---|
| 125 Unnumbered Provisional Patent Application 06/98 06/97 12/97 12/97 (priority) | *HHCS OWNS* | *Farone:* It does contain the charged particle technology and should be assigned to HHCS.<br><br>*Buskop:* Generally an apparatus for treating coal. Uses treatment of charged colloidal particles and falls under the Assignment. | *Mallinckrodt:* Testified generally as to Exhibits 124–132, that they are distinct because they are various methods of treating fuels, using colloidal silica or manipulating green house gases and have nothing to do with a quadrapolar magnetic array. Claims of various patents reveal all claim different inventions and some use magnets or magnetic fields but they are not related inventions and are NOT covered by the Assignment. |
| 126 Unnumbered Provisional Patent Application 06/98 06/97 12/97 12/97 (priority) | *HHCS OWNS* | *Farone:* It incorporates the charged particle technology and is covered by the Assignment.<br><br>*Buskop:* Figure 8, page 28 shows the 4 magnet figure, showing quadrapolar magnets. Seems to fit within the Assignment. | *Mallinckrodt:* Testified generally as to Exhibits 124–132, that they are distinct because they are various methods of treating fuels, using colloidal silica or manipulating green house gases and have nothing to do with a quadrapolar magnetic array. Claims of various patents reveal all claim different inventions and some use magnets or magnetic fields but they are not related inventions and are NOT covered by the Assignment. |
| 127 WO 02/079356 | *HHCS OWNS* | *Farone:* It incorporates the charged particle technology and is covered by the Assignment.<br><br>*Buskop:* a process for treating coal and after looking at all of the claims, find that uses quadrapolar magnetic array as shown in figure 3 and 4 and falls under Assignment, Section A2 and C13. | *Mallinckrodt:* Testified generally as to Exhibits 124–132, that they are distinct because they are various methods of treating fuels, using colloidal silica or manipulating green house gases and have nothing to do with a quadrapolar magnetic array. Claims of various patents reveal all claim different inventions and some use magnets or magnetic fields but they are not related inventions and are NOT covered by the Assignment. |
| 128 WO 02/078865 App. No. PCT/US 02/10128 | *HHCS OWNS* | *Farone:* It incorporates the charged particle technology and is covered by the Assignment.<br><br>*Buskop:* Incorporates process of colloidal silicon that has been treated with a magnet. References another patent and incorporates technology of quadrapolar magnetic array. Fits under Assignment, Section A2 and C13. | *Mallinckrodt:* Testified generally as to Exhibits 124–132, that they are distinct because they are various methods of treating fuels, using colloidal silica or manipulating green house gases and have nothing to do with a quadrapolar magnetic array. Claims of various patents reveal all claim different inventions and some use magnets or magnetic fields but they are not related inven- |

| | | | |
|---|---|---|---|
| | | | tions and are NOT covered by the Assignment. |
| 129 US 09/749,-243 | *HHCS OWNS* | *Farone:* It incorporates the charged particle technology and is covered by the Assignment. <br><br> *Buskop:* Describes the use of quadrapolar steep field gradients and comes within the Assignment definitely under C13 and possibly under other sections as well. | *Mallinckrodt:* Testified generally as to Exhibits 124–132, that they are distinct because they are various methods of treating fuels, using colloidal silica or manipulating green house gases and have nothing to do with a quadrapolar magnetic array. Claims of various patents reveal all claim different inventions and some use magnets or magnetic fields but they are not related inventions and are NOT covered by the Assignment. |
| 130 WO 97/49473 | *HHCS OWNS* | *Farone:* It incorporates the charged particle technology and is covered by the Assignment. <br><br> *Buskop:* Does NOT fall within the scope of Exhibit A. | *Mallinckrodt:* Testified generally as to Exhibits 124–132, that they are distinct because they are various methods of treating fuels, using colloidal silica or manipulating green house gases and have nothing to do with a quadrapolar magnetic array. Claims of various patents reveal all claim different inventions and some use magnets or magnetic fields but they are not related inventions and are NOT covered by the Assignment. |
| 131 Not Disclosed for Protective Purposes | *HHCS OWNS (Under Employment Agreement Only)* | *Farone:* Not covered by the Assignment because does not embody the charged particle technology. <br><br> *Buskop:* Describes what is contained (not disclosed by the court) and concludes falls within Exhibit A. | *Mallinckrodt:* Testified generally as to Exhibits 124–132, that they are distinct because they are various methods of treating fuels, using colloidal silica or manipulating green house gases and have nothing to do with a quadrapolar magnetic array. Claims of various patents reveal all claim different inventions and some use magnets or magnetic fields but they are not related inventions and are NOT covered by the Assignment. |
| 132 Not Disclosed for Protective Purposes | *HHCS OWNS* | *Farone:* Embodies charged particle technology and is covered by the Assignment. <br><br> *Buskop:* Uses a magnetic booster the same as described in other patents (not disclosed by the court) and falls within Exhibit A. | *Mallinckrodt:* Testified generally as to Exhibits 124–132, that they are distinct because they are various methods of treating fuels, using colloidal silica or manipulating green house gases and have nothing to do with a quadrapolar magnetic array. Claims of various patents reveal all claim different inventions and some use |

magnets or magnetic fields but they are not related inventions and are NOT covered by the Assignment.

*4. Intellectual Property Belongs to HHCS Under Dr. Holcomb's Breach of Duty*

▮▮▮ In addition to the Employment Agreement, Dr. Holcomb, acting as Chief Scientific Officer, and then as self-appointed Chief Manager of HHCS, had a pre-existing fiduciary duty to assign those inventions during his employment to HHCS. Under Tennessee law, it is well established that officers and directors of a corporation owe a fiduciary duty to the corporation and its members and, while occupying such a position of trust, must act in the utmost good faith. Corporate officers and directors owe certain duties to the corporation as a result of their fiduciary relation to the corporation. *Knox–Tenn Rental Co. v. Jenkins Ins., Inc.,* 755 S.W.2d 33, 36 (1988); *see Neese v. Brown,* 218 Tenn. 686, 692–93, 405 S.W.2d 577, 580–81 (Tenn. 1964); *T.C.A. § 48–18–301, –302, –403 (1995);* 3 Fletcher Cyclopedia of the Law of Private Corporations § 837.60 (per. ed. rev.vol.1994) [hereinafter Fletcher]. These duties are the duty of loyalty and the duty of care.

The duty of loyalty in essence involves conflicting economic or other similar interests [and] is transgressed when a corporate fiduciary, whether director or officer, uses his or her corporate office to promote, advance or effectuate a transaction between the corporation and such person, and that transaction is not substantively fair to the corporation.

*Id.* (footnotes omitted). The Tennessee General Assembly codified this concept of duty with the enactment of Tennessee Code Annotated § 48–18–302 (1995).[40]

40. *T.C.A. § 48–18–302. Conflict of interest transactions*

(a) A conflict of interest transaction is a transaction with the corporation in which a director or officer of the corporation has a direct or indirect interest. A conflict of interest transaction is not voidable by the corporation solely because of the director's or officer's interest in the transaction if any one (1) of the following is true:

(1) The material facts of the transaction and the director's or officer's interest were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved, or ratified the transaction;

(2) The material facts of the transaction and director's or officer's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved, or ratified the transaction; or

(3) The transaction was fair to the corporation.

(b) For purposes of this section, a director or officer of the corporation has an indirect interest in a transaction if, but not only if:

(1) Another entity in which the director or officer has a material financial interest or in which the director or officer is a general partner is a party to the transaction; or

(2) Another entity of which the director or officer is a director, officer, or trustee is a party to the transaction and the transaction is or should be considered by the board of directors of the corporation.

(c) For purposes of subdivision (a)(1), a conflict of interest transaction is authorized, approved, or ratified if it receives the affirmative vote of a majority of the directors on the board of directors (or on the committee) who have no direct or indirect interest in the transaction, but a transaction may not be authorized, approved, or ratified under this section by a single director. If a majority of the directors who have no direct or indirect interest in the transaction vote to authorize, approve, or ratify the transaction, a quorum is present for the purpose of taking action under this section. The presence of, or a vote cast by, a director with a direct or indirect interest in

Specifically, a conflict of interest transaction in Tennessee "is a transaction with the corporation in which a director or officer of the corporation has a direct or indirect interest." Tenn.Code Ann. § 48–18–302(a) (1995). If certain circumstances exist, such as when a director fully discloses his or her interest, the corporation may not void the transaction solely because of the director's or officer's interest. *Id.* The question of whether a director or officer has breached their duty of loyalty is one of fact and depends on all of the surrounding circumstances. *Fitch v. Midland Bank & Trust Co.*, 737 S.W.2d 785, 788 (Tenn.Ct. App.1987); *see Neese,* 405 S.W.2d at 581.

The court finds that Dr. Holcomb's duty of loyalty to HHCS, as Chief Scientific Officer and acting Chief Manager required that he assign all inventions to HHCS during his tenure. Although there is no directly controlling Tennessee case law on the specific issue of assignment of patents by an officer of the company, there are decisions from other jurisdictions that this court finds persuasive. There are cases from several jurisdictions which hold under various theories that when the employee/inventor is the President of the corporation and "ran the plaintiff's business in every respect," *Mechanical Plastics Corp. v. Thaw,* 197 U.S.P.Q. 651, 652, 1977 WL 22754 (S.Ct. Nassau County 1977), that he owed a duty to assign all inventions and patents to the business. These theories

include: (1) Dr. Holcomb had a fiduciary duty to act in HHCS interest and not deprive it of any "corporate opportunity," *North Branch Products, Inc. v. Fisher,* 131 U.S.P.Q. 135, 137, 1961 WL 8101 (D.D.C.1961); *Grip Nut Company v. Sharp,* 150 F.2d 192, 197 (7th Cir.1945); *Mechanical Plastics Corp. v. Thaw, supra,* at 654; (2) that Dr. Holcomb was the "alter ego" of the corporation, *Dowse v. Federal Rubber Company,* 254 F. 308 (N.D.Ill.1918); or (3) that Dr. Holcomb led the corporation to believe that the patents were a corporate asset, *Oliver v. Lockport Mills,* 6 Misc.2d 356, 362, 163 N.Y.S.2d 317 (S.Ct. Niagara County 1956); *Preis v. Eversharp Inc.,* 154 F.Supp. 98, 102–103, 114 U.S.P.Q. 324 (E.D.N.Y.1957). *See Great Lakes Press Corp. v. Froom,* 695 F. Supp. 1440, 1446 (W.D.N.Y., 1987).

Under any of these theories, the court finds that all of the proof in this case overwhelmingly supports the conclusion that Dr. Holcomb had a duty to assign the patents, patent applications and inventions to HHCS while acting as the Chief Scientific Officer and/or self-appointed Chief Manager of HHCS. This is especially true in light of Dr. Holcomb's treatment of HHCS's income as his personal piggy bank to fund not only further development of his current ideas, but the creation of new ones. The court therefore finds, that not only is HHCS the rightful owner of the

the transaction does not affect the validity of any action taken under subdivision (a)(1), if the transaction is otherwise authorized, approved, or ratified as provided in that subdivision.

(d) For purposes of subdivision (a)(2), a conflict of interest transaction is authorized, approved, or ratified if it receives the vote of a majority of the shares entitled to be counted under this subsection. Shares owned by or voted under the control of a director or officer who has a direct or indirect interest in the transaction, and shares owned by or voted under the control of an

entity described in subdivision (b)(1), may not be counted in a vote of shareholders to determine whether to authorize, approve or ratify a conflict of interest transaction under subdivision (a)(2). The vote of those shares, however, shall be counted in determining whether the transaction is approved under other sections of chapters 11–27 of this title. A majority of the shares, whether or not present, that are entitled to be counted in a vote on the transaction under this subsection constitutes a quorum for the purpose of taking action under this section.

disputed property by virtue of the Employment Agreement and Assignment, but also based on Dr. Holcomb's breach of his fiduciary duty and duty of loyalty to HHCS under Tennessee law.

### 5. Conclusions as to the Declaratory Judgment Action

The court finds, therefore, that as a matter of law, the Employment Agreement provides that HHCS is the rightful owner of Exhibits 103–108, 114–117, 119, 121–130. The court also finds, that as a matter of law, HHCS is the rightful owner of Exhibits 112, 119, 120, 110, 111, and 113 as such were pre-existing intellectual property covered by the Assignment. The remaining patents, patent applications or otherwise named intellectual property found at Exhibits 103–109, 112, 115–118, 121–129, 131, and 132, fall under the Assignment's broad grant of everything "directly or indirectly" relating to the assigned property, including know how and are also HHCS's property.

Even if the court is mistaken that the Employment Agreement and Assignment are clear on their face and subject to interpretation as a matter of law, the court nonetheless finds that the proof overwhelmingly supports the court's conclusions. Accordingly, the court finds that HHCS more than met its burden of proof to demonstrate it is the rightful owner of the disputed property by the mountains of documentary evidence, and the strong credibility of all witnesses.

Furthermore, the court finds, as a separate, independent basis, that Dr. Holcomb breached his duty of loyalty to HHCS. The court therefore finds, that not only is HHCS the rightful owner of the disputed property by virtue of the Employment Agreement and Assignment, but also based on Dr. Holcomb's breach of his fiduciary duty and duty of loyalty to HHCS under Tennessee law.

### C. Monetary Claims

The remaining allegations in these adversary proceedings concern HHCS' request for: (1) substantive consolidation of the related, non-debtor entities alleging that the assets and liabilities of the individual entities are so intertwined that absent the substantive consolidation no meaningful relief can be granted, or (2) alternatively, equitable factors exist warranting the court to pierce the corporate veils of each of the Dr. Holcomb related entities; or (3) alternatively, for the court to find that Dr. Holcomb, and his various related entities either owe the debtor money for improperly allocated expenses between companies, or because of alleged fraudulent conveyances pursuant to 11 U.S.C. § 548(a)(1) and Tennessee fraudulent conveyance law. The court finds that HHCS has shown it is entitled to relief on the account receivable and fraudulent conveyance actions, and therefore, the court need not address the alternative remedies of substantive consolidation or corporate veil piercing.[41]

### 1. The Account Receivables Actions

██ As noted in the factual history above, Jackson, Howell and Associates, P.C. was first hired by Mr. Townsend when he was on the audit committee at HHCS to investigate what he considered

---

**41.** Although the record is replete with examples of monetary improprieties and fully supports a finding of fraud, the court does not address the substantive consolidation or corporate veil piercing issues because the less draconian remedy of ordering payments on success in the fraudulent conveyance and property recovery actions makes the debtor whole without involving the myriads of officers, directors, management, members, investors, shareholders, and other interested parties involved in the multiple Dr. Holcomb controlled entities.

improprieties in Dr. Holcomb's management and control of HHCS, specifically with regard to the company's finances. After the bankruptcy petition was filed, the Official Committee of Unsecured Creditors then engaged JHA to inspect HHCS's books and records by way of "Agreed Upon Procedures" for the period of January 1, 1995 until April 13, 2001. The accountant's report, known as "The Agreed Upon Procedures Report" was issued on December 3, 2001, and was entered into evidence at trial as Exhibits 6 and 7.[42]

HHCS also relied upon the expert testimony of Michael Sterling, a Certified Public Accountant, and Senior Audit Manager at the JHA firm. Mr. Sterling explained the difference between a full-blown audit and an "agreed upon procedures" audit. In an audit situation, an accountant is normally hired by the Board to provide an opinion as to whether financial statements are materially stated. Under agreed upon procedures, however, normally an accountant is hired to provide answers to very specific questions. Mr. Sterling testified that Mr. Townsend hired JHA to assist HHCS in preparation of its monthly operating reports submitted to the Bankruptcy Court after he took over management of HHCS post-petition. The Unsecured Creditors Committee also hired JHA to perform an "agreed upon procedures" report to: (1) go through about 24 banker's boxes of information that contained books and records of HHCS, (2) to examine HHCS's "Quick Books," (3) to note any findings relating to conflict of interest transactions, related party transactions, or any "GAAP" problems, and (4) to investi-

gate whether transactions during the relevant period met authorization requirements under the Amended and Restated Operating Agreement. Although criticized by the defendants for not performing a full audit, the Creditors' Committee found a full audit cost prohibitive within the bankruptcy context.

Mr. Sterling testified that based on the limitations in the Amended and Restated Operating Agreement, he searched for approval for the specific transactions reviewed. If he could not find approval of a transaction by specific authorization in the Operating Agreement, he checked for Board approval and/or Member Approval. Absent finding appropriate documentation of approval of a specific transaction under review, if a particular transaction fell under the category of conflict of interest or related party transaction, it was reported as such. Part of his guide for what constituted a "conflict of interest" transaction, was the relevant Tennessee Code Annotated statutes defining conflict of interest transactions in Tennessee. Mr. Sterling testified that, utilizing his expertise, he attempted to characterize what transactions were conflict of interest transactions.

Mr. Sterling concluded, based upon his review, that in his expert opinion, that various entities, as indicated in the Table directly below, had received monies or benefits from HHCS for which they owed HHCS $4,033,287.74.

| Entity | Amount |
| --- | --- |
| Acu–Pain, LLC | $ 4,464.04 |
| Emissions Control LLC | $ 790.00 |
| Holcomb International, LLC | $ 231,691.00 |

**42.** Defendants objected to the entry of the JHA Report, claiming that such was inadmissible hearsay, and further that allowing entry of this exhibit would hopelessly "poison the record." The court overruled the objections at trial finding sufficient reliability, and reit-

erates that finding here. Although the defendants are clearly unhappy with the findings of the JHA Report, they raise no valid basis to exclude the report, and their objections went more to the weight to be accorded the report rather than its admissibility.

| | |
|---|---|
| Holcomb Companies, LLC | $1,890,806.13 |
| Holcomb Management, Inc. | $ 271,157.23 |
| Holcomb Technologies, LLC | $ 67,504.28 |
| Holcomb Medical Research Institute | $ 8,087.45 |
| Novatech, LP | $ 7,137.68 |
| Novatech, Inc. | $ 174,152.53 |
| Robert R. Holcomb | $1,134,159.26 |
| ROM Technologies | $ 300.00 |
| Virtual Manufacturing and Development, LLC [43] | $ 243,038.14 |
| *TOTAL* | $4,033,287.74 |

These numbers were largely based, according to Mr. Sterling, upon reallocated expenses between entities and salary issues. Based on the entirety of the record before him, Mr. Sterling testified that he found a 50/50 allocation (50% to HHCS, and 50% to other entities), suggested by the HHCS Board, to be reasonable in recalculating the various transactions. While Mr. Sterling admits that the 50/50 allocation is an assumption, he testified that he believed it was a reasonable assumption based upon the Board's recommendation, his expertise, and the books and records he reviewed.

Mr. Sterling testified at length about the specifics of reallocating the expenses between the different entities. The court found his testimony and report both informative and helpful. Mr. Sterling concluded that at some point HHCS began allowing receivables to be offset against the wages. He notes that Ms. Hubbard accurately reported such, but HHCS was allowing the offset without deducting for required federal withholding for such items as FICA and Medicare. This practice was allowing a much greater offset than was actually available. Mr. Sterling reversed those transactions. The books reflect that on December 31, 2000, after an Ernst & Young audit, Ms. Hubbard also reversed these transactions. Curiously, however, Ms. Hubbard then reverses again on April 13, 2001, the petition date of the bankruptcy.[44] Sterling testified that he therefore undid all of the transactions, set up the receivables and payable again, and recalculated all transactions. This lead to approximately $2.4 million of the approximately $4 million owed.[45]

Mr. Sterling explained that there were some transactions he simply did not have enough information to determine whether such were authorized or not. He therefore presented those transactions to the Board of Governors of HHCS. The Board then ratified some transactions which Mr. Sterling then left unaltered, and if the Board was unaware or was unsure of others, those transactions were captured and listed as unauthorized. A large part of these questionable expenses involved legal fees for which there was not supporting docu-

43. By Order entered October 8, 2004, summary judgment was granted against Virtual Manufacturing and Development, LLC and Acu–Pain, LLC in the amounts shown above.

44. April 13, 2001 is the day that the fraudulent involuntary petition was filed by the three employees of HHCS, including Ms. Hubbard. The basis for the involuntary petition was a claim by the employees for unpaid wages. The reversal by Ms. Hubbard that undid the offset of receivables against wages on April 13, 2001, provided the accounting basis to claim "unpaid" wages. This is further proof of the attempts by Dr. Holcomb and his loyal employees to manipulate HHCS for Dr. Holcomb and his insiders' benefit instead of for the Members' or creditors' benefits. *See* *T.C.A. § 48–18–302;* and *18 U.S.C. § 157.*

The court orders that a copy of this Memorandum be sent to the United States Attorney's Office for consideration of whether the actions of Dr. Holcomb, Julia Hubbard, Sidney Bogardus, and Barbara McCullough violated any of the bankruptcy criminal provisions found in Title 18, specifically, 11 U.S.C. § 153 and 11 U.S.C. § 157.

45. Although inter-company debits and credits were noted in the HHCS books and records, Mr. Sterling testified that he found no promissory notes or loan agreements.

mentation or invoice.[46]

Mr. Sterling ultimately concluded that, in his expert opinion, based on the agreed upon procedures review and his expertise in accounting, that the defendants listed above owed the debtor a total of $4,033,287.74.

The defendants relied on the testimony of Julia Hubbard, Dr. Holcomb and expert, Martin Leventhal, in rebutting HHCS's allegations. Ms. Hubbard testified at great length, not only about the books and records of HHCS, but about the overall business structure of HHCS and all of Dr. Holcomb's related entities. Although portions of Ms. Hubbard's testimony were credible, the court found Ms. Hubbard's memory selective, and her answers protective of Dr. Holcomb. Despite her attempts to explain or rationalize certain transactions, or other occurrences while Dr. Holcomb was in control of HHCS, her credibility was dubious given Dr. Holcomb's obvious manipulation of Ms. Hubbard. Ms. Hubbard was not free to be an independent witness by any stretch of the imagination, as she is still employed by Dr. Holcomb's Demeter Systems, and because of her long-standing and intertwined history with Dr. Holcomb.

Mr. Leventhal is an Executive Partner at Wyneck, Sanders & Leventhal, a CPA firm. Mr. Leventhal reviewed the JHA report, but did not review the books and records and 24 banker's boxes examined by JHA. Mr. Leventhal's testimony criticized JHA's reversal of a $2.4 million debt to Vanderbilt University. Even though Mr. Sterling's reversal of the $2.4 million debt to Vanderbilt had absolutely no effect on the approximately $4 million Dr. Holcomb and his entities allegedly owe to HHCS, in Mr. Leventhal's opinion, Mr. Sterling's reversal of the debt was incorrect.[47] The remainder of Mr. Leventhal's testimony is devoted to items that he found "strange" but he admitted without doing an audit himself, he could not fully determine any item's efficacy.

As noted by this court in a relatively recent decision, deciding between expert testimony is often difficult in areas such as accounting, valuation of assets or other similar inquiries because such matters are not exact sciences:

> Because the valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses. *See In re Coates,* 180 B.R. 110, 112 (Bankr.D.S.C.1995) ("The valuation process is not an exact science, and the court must allocate varying degrees of weight depending upon the court's opinion of the credibility of . . .

---

**46.** The legal fees, especially those related to Gerald Easter were largely undocumented and unsupported. Dr. Holcomb wrote a memo to Julia Hubbard directing that Mr. Easter would spend 90% of his time on HHCS and 10% on other Holcomb related entities, but according to Mr. Sterling, this allocation is not accurate, and Easter was being overpaid by HHCS. Other questionable legal fees paid by HHCS include $105,884.51 paid to Dr. Holcomb's personal counsel in defense of a lawsuit unrelated to these proceedings. Mr. Sterling's report details numerous instances where HHCS was being used by Dr. Holcomb to pay legal fees for any and all of his interests whether related to HHCS or not.

**47.** Mr. Leventhal's criticism of Mr. Sterling's reversal of that debt was that "you really have to have some courage to reverse an Ernst & Young accrual," and that Mr. Sterling had no authority for totally disregarding it. Mr. Leventhal admitted, however, that he did not look at any of the underlying documentation regarding the Vanderbilt debt, and did not look at any of Ernst & Young's documentation, but nonetheless, he thought JHA should have booked it and noted that it was in dispute.

[the appraisal] evidence."). As noted by the Bankruptcy Court for the Southern District of Ohio *In re Smith* 267 B.R. 568, 572–573 (Bankr.S.D.Ohio 2001), when "weighing conflicting appraisal testimony, courts generally evaluate a number of factors, including: ... the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented." *Id.* (internal citations omitted). A bankruptcy court is not bound to accept the values contained in the parties' appraisals; rather, it may form its own opinion considering the appraisals and expert testimony. *Id.* at 573; *see, e.g., In re Abruzzo,* 249 B.R. 78, 86 (Bankr.E.D.Pa.2000) ("I am left to some extent with the proverbial battle of the appraisers. Finding merit to both their positions, the only conclusion I can reach is to find some value in between.") *In re American HomePatient, Inc.* 298 B.R. 152, 173–174 (Bankr.M.D.Tenn.2003). The same is true in this case, the forensic accounting undertaken by JHA is not an exact science, and is necessarily based on at least some educated assumptions. It is the court's role to determine, based on the factors listed above, if those assumptions are well based, and who has best supported their opinions.

In this case, the court finds that Mr. Sterling was the more credible witness. He was hired by the Unsecured Creditors' Committee to perform an independent report at a time when no litigation was pending. His opinions are well supported by the books and records provided by HHCS.[48] Mr. Leventhal, on the other hand, was hired at the eleventh hour to respond to a summary judgment deadline only days away when he prepared his report. He admitted that he had not even read all of the exhibits attached to the JHA report, and that his report was merely a critique, and not an independent study.

The court finds that based on the credible testimony of all of the debtor's witnesses, and especially Mr. Sterling, that HHCS is owed a total of $4,033,287.74 from the defendants as listed in the above table.

*2. The Fraudulent Conveyance Actions*

In addition to the monies owed for, among other things, improperly allocated salaries and expenses above, HHCS also contends, that based upon the books and records of HHCS, HHCS, under Dr. Holcomb, made advances to various defendants without receiving consideration in return. Therefore, according to HHCS, the following represent avoidable transactions pursuant to Tennessee fraudulent conveyance law and 11 U.S.C. § 548. Those amounts are as follows:

| Entity | Amount |
| --- | --- |
| Acu–Pain LLC | $ 4,539.04 |
| Holcomb Companies, LLC | $ 613,969.58 |
| Holcomb International, LLC | $ 130,446.04 |
| Holcomb Management, Inc. | $ 397,408.73 |
| Holcomb Technologies, LLC | $ 37,278.76 |
| Holcomb Medical Research Institute | $ 145,915.40 |
| Novatech, LP | $ 5,949.89 |
| Novatech, Inc. | $ 156,491.58 |

**48.** Mr. Sterling's use of the 50/50 allocation was supported by the recommendation of the Board of Governors, his review of all of HHCS's books and records, and his expertise. Dr. Brad Worthington, a one time employee of HHCS, also testified that he believed this to be a reasonable allocation.

| | |
|---|---|
| Robert R. Holcomb | $1,134,159.26 |
| Virtual Manufacturing and Development, LLC | $ 382,617.30 |
| *TOTAL* | $1,874,616.32 |

 The bankruptcy fraudulent conveyance statute is found at 11 U.S.C. § 548(a), and allows transfers to be avoided for actual fraud, 11 U.S.C. § 548(a)(1)(A) or constructive fraud, 11 U.S.C. § 548(a)(1)(B). The statute provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily-

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2) (A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B) (i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction or was about to engage in business or a transaction for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

Fraudulent intent is rarely proved by direct evidence. Intent need not be shown by direct, actual evidence, but can be proved through objective indicia of fraud or "badges of fraud." *In re Sergio, Inc.,* 16 B.R. 898 (Bankr.D.Hawai'i 1981). In the presence of badges of fraud, fraudulent intent can be presumed. *Staats v. Harper (In re Harper),* 132 B.R. 349 (Bankr. S.D.Ohio 1991). A determination of whether a conveyance is fraudulent is dependent upon the facts and circumstances of each case; such fraud is typically proven by circumstantial evidence. *Macon Bank & Trust Co. v. Holland,* 715 S.W.2d 347, 349 (Tenn.Ct.App.1986). Such circumstantial indicators of fraud are often termed as "badge[s] of fraud" and have been described as "any fact[s] that throw[ ] suspicion on the transaction and call [ ] for an explanation." *Id.* More specifically, the courts in Tennessee have held that the following are considered badges of fraud:

1. The transferor is in a precarious financial condition.

2. The transferor knew there was or soon would be a large money judgment rendered against the transferor.

3. Inadequate consideration was given for the transfer.

4. Secrecy or haste existed in carrying out the transfer.

5. A family or friendship relationship existed between the transferor and the transferee(s).

6. The transfer included all or substantially all of the transferor's nonexempt property.

7. The transferor retained a life estate or other interest in the property transferred.

8. The transferor failed to produce available evidence explaining or rebutting a suspicious transaction.

9. There is a lack of innocent purpose or use for the transfer.

*Stevenson v. Hicks (In re Hicks)*, 176 B.R. 466, 470 (Bankr.W.D.Tenn.1995) (citing several Tennessee appellate decisions). The presence of one or more of the badges of fraud gives rise to a presumption of fraud and consequently shifts the burden of disproving fraud to the defendant. *See Macon Bank*, 715 S.W.2d at 349. *Loeber v. Loeber (In re Loeber)*, 12 B.R. 669 (Bankr.D.N.J.1981); *see also Staats v. Harper (In re Harper)*, 132 B.R. 349 (Bankr.S.D.Ohio 1991). Although the presence of a single badge may only raise the suspicion of debtor's fraudulent intent, the confluence of several badges can be conclusive evidence of fraudulent intent, absent significantly clear evidence of debtor's legitimate supervening purpose. *Max Sugarman Funeral Home v. A.D.B. Investors*, 926 F.2d 1248 (1st Cir.1991); *see also F.D.I.C. v. Anchor Prop.*, 13 F.3d 27 (1st Cir.1994); *In re Warner*, 87 B.R. 199 (Bankr.M.D.Fla.1988); *In re Gabor*, 280 B.R. 149, 157 (Bankr.N.D.Ohio 2002).

For HHCS to prevail under Section 548(a)(1)(A), it must show that, when Dr. Holcomb was in control of HHCS, transfers were made with actual intent to hinder, defraud, or delay creditors. In order to avoid a transaction under Section 548(a)(1)(B), the court must determine both that HHCS received less than reasonably equivalent value for the transfers or obligations made, and that HHCS was insolvent at the time of the transactions or was rendered insolvent by the transac-

tions. *In re Greenfield*, 249 B.R. 856, 858 (Bankr.E.D.Mich.2000).

Similarly, under Tennessee law, a conveyance may be fraudulent for two reasons: one made with actual intent to delay, hinder, or defraud creditors, *T.C.A. § 66-3-101*, or one made without fair consideration if the grantor is insolvent or the conveyance renders him/her insolvent, *T.C.A. § 66-3-305*. *Orlando Residence, Ltd. v. Nashville Lodging Co.*, 104 S.W.3d 848, 854 (Tenn.Ct.App.2002); *Hicks v. Whiting*, 149 Tenn. 411, 444, 258 S.W. 784, 794 (1924) ("A conveyance is considered fraudulent in Tennessee if it is made '[w]ithout a fair consideration, leaving the grantor insolvent; or . . . [m]ade with actual intent to hinder, delay or defraud creditors.' "). Under the Bankruptcy Code, "[t]he trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim. . . .". *11 U.S.C. § 544(b)*.

■ Under section 548(a), HHCS must show that Dr. Holcomb made or caused to be made through Ms. Hubbard, transfers to these defendants with the intent to hinder, defraud or delay creditors of HHCS. Of course, neither Dr. Holcomb, the business defendants, nor Ms. Hubbard, admit to actual fraud, but the court finds sufficient "badges of fraud" to infer such. Dr. Holcomb was using HHCS as his personal "piggy bank" to fund all of his various interests.[49] The totality of the facts in this

---

49. Exhibit 12, showing a combined estimate of the "Holcomb Entities" expenses is just another example. In that document, Ms. Hubbard has prepared a report showing the combined expenses for items such as automobile expenses, salaries, insurance, legal fees, and travel on a monthly and yearly basis. When questioned as to which Holcomb entities were included, Ms. Hubbard's selective memory could recall only that "Holcomb En-

tities" referred to different entities at different times, but all expenses were bundled together without regard to business identity, and paid with HHCS money.

The General Ledger is replete with examples of Dr. Holcomb's personal use of HHCS funds, including such entries as express mail charges to his son in college, numerous restaurant charges, official transcripts for his

case unquestionably show the intent of HHCS, under Dr. Holcomb's leadership, to defraud. Former Office Manager, Kimberly Lewis, testified that she heard Dr. Holcomb frequently mention the need to protect his assets. Dr. Brad Worthington likewise confirmed Dr. Holcomb's failure to properly separate HHCS from his other "Holcomb Entities." Other proof, but certainly not the only other proof, includes: (1)Dr. Holcomb's hasty attempt to transfer assets to Isle of Man entities, (2) his entangled web of business entities, (3) his instructions to Ms. Hubbard in paying and accounting for transactions, (4) his outright fraud in directing the involuntary bankruptcy filing, and (5) his continued deceptions to the Members of HHCS.

Accordingly, the court finds sufficient indicia of fraud to find that HHCS, under Dr. Holcomb's direction, fraudulently conveyed the amounts to the defendants listed in the above table. The court orders such amounts be repaid to HHCS by the named defendants in the amounts listed.

 Even if the court is somehow mistaken that sufficient badges of fraud were present, the court nonetheless finds that HHCS showed fraudulent transfers were made under Section 548(a)(1)(B). Section 548(a)(1)(B) has no intent requirement and allows avoidance if the conveyances were made for less than reasonably equivalent value, and while HHCS was insolvent or the transactions rendered HHCS insolvent. The court heard proof at trial from both HHCS and Defendants' witnesses, that HHCS's only real source of income was the AmWay royalty payment from the

licensing agreement. The debtor, however, had provided funds to all of the defendants (as listed in the above chart) and received no benefit in return.

HHCS's own books and records are the best proof of these transactions. It appears that HHCS did, at least, record all inter-company transactions in HHCS's books. However, it also appears that some "fuzzy" accounting attempted to disguise the true nature of these inter-company loans, when such were reclassified from debts owed to HHCS to debts on Dr. Holcomb's personal receivable account. Regardless of how they were treated on the books, it is clear that HHCS advanced these defendants significant value, and received nothing in exchange. The general ledger supports the court's finding that Dr. Holcomb used the only entity within his repertoire, HHCS, to pay the expenses, salaries and losses for his other business entities, and received no reasonably equivalent value in return.

As to insolvency, Mr. Sterling testified that HHCS never had a positive net worth, and that even after the reallocations, HHCS was probably never a solvent company. Julia Hubbard's testimony also confirmed that HHCS was insolvent.[50] The court finds that HHCS has shown at minimum, that the evidence preponderates in favor of a finding that not only were the above advances made for little or no value, but also, such were made while HHCS was insolvent pursuant to 11 U.S.C. § 548.

### 3. Conclusions on Monetary Actions

The court finds a solid record supporting the imposition of monetary judgments

---

son, Blockbuster rental fees, and gifts for Dr. Engstrom's baby.

**50.** Ms. Hubbard testified that HHCS did not have any money to pay its bills. She agreed that on April 13, 2001, HHCS was not solvent from a balance sheet perspective. This is further supported by the letter written by Jim

Morton informing the Members of the "surprise" involuntary chapter 7 filing, and HHCS's filing of a chapter 11 petition where he tells the Members that HHCS cannot deny that it has not been paying bills as they are due.

against each defendant as named above in the amounts listed based upon improperly allocated expenses, etc., as more particularly described above, and upon the fraudulent transfers under 11 U.S.C. § 548 and Tennessee fraudulent conveyance law. Accordingly, the court finds that HHCS is entitled to a judgment against the defendants pursuant to 11 U.S.C. §§ 544(b) and 550(a).[51]

### IV. Conclusions

These matters deteriorated into a personal crusade for Dr. Holcomb, and "a man will fight harder for his interests than for his rights." (Napoleon Bonaparte). In this case, Dr. Holcomb, an obviously intelligent and creative inventor fought hard for what he had created. What he failed to remember was that others have paved the way financially and otherwise to allow him the freedom to create. He cannot therefore, secret away property, even if it sprung from his creative mind, that others have rights to. The court therefore finds that:

As to all matters, the court finds that: (1) defendants were not entitled to a jury trial, or if a jury was properly demanded, such was waived in both adversary proceedings; (2) a default judgment is hereby *GRANTED* against the following defendants as to the ownership of all patents and patent applications or otherwise identified intellectual property not produced by the defendants under the confidentiality agreement but previously ordered by the court against Robert R. Holcomb, Quart Ltd., Holcomb International, LLC, ROM Technologies, LLC, Holcomb Companies, LLC, Holcomb Scientific Creations LLC, Flavor Tech, LLC, Newawk, LLC, Fluide Electret, LLC, Green Coal, LLC, SGT Technology Holdings, LLC, Emissions Control, LLC, Holcomb Management, Inc., Water Resources Technology, Inc., Holcomb Investments, L.P., Holcomb Medical Trust, Minos Investments, Holcomb Medical Research Institute, Demeter Systems LLC, Luca Enterprises Ltd., Selene Holdings LLC, Aether Power, LLC, and Holcomb Scientific, Inc., and finds that Holcomb Healthcare Services, LLC is the rightful owner of all patents and patent applications or otherwise identified intellectual property that were not turned over as required; (3) the injunction sought by HHCS is dismissed without prejudice to raise those issues in some later proceeding should the issues become ripe; (4) as a matter of law, the Employment Agreement provides that HHCS is the rightful owner of Exhibits 103–108, 114–117, 119, 121–130; (5) as a matter of law, HHCS is the rightful owner of Exhibits 112, 119, 120, 110, 111, and 113 as such were pre-existing intellectual property covered by the Assignment; (6) the remaining patents, patent applications or otherwise named intellectual property found at Exhibits 103–109, 112, 115–118, 121–129, 131, and 132, fall under the Assignment's broad grant of everything "directly or indirectly" relating to the assigned property, including know how and are also HHCS's property; (7) even if the court is mistaken that the Employment Agreement and Assignment are clear on their face and subject to interpretation as a matter of law, the court nonetheless finds that the proof overwhelmingly supports the court's conclusions; (8) Dr. Holcomb breached his duty

---

**51.** 11 U.S.C. § 544(b) allows HHCS to avoid the transfer of an interest that is voidable under applicable law by a creditor holding an unsecured claim. Section 544(b) allows recovery under the Tennessee fraudulent conveyance statutes.

11 U.S.C. § 550(a) provides that to the extent that a transfer is avoided, the trustee may recover for the benefit of the estate the property transferred or the value of such property from the named defendants above.

of loyalty to HHCS, and therefore not only is HHCS the rightful owner of the disputed property by virtue of the Employment Agreement and Assignment, but also based on Dr. Holcomb's breach of his fiduciary duty and duty of loyalty to HHCS under Tennessee law; (9) based on the credible testimony of all of the debtor's witnesses, and especially Mr. Sterling, that HHCS is owed a total of $4,033,287.74 from the defendants as listed in the above Table in Section C2 of this Opinion; (10) HHCS is entitled to a judgment against the defendants pursuant to 11 U.S.C. §§ 544(b) and 550(a) as found in the Table in Section C3 of this Opinion; (11) HHCS's alternative relief counts seeking substantive consolidation and/or piercing of the corporate veils of the defendants is hereby dismissed; (12) HHCS failed to demonstrate its entitlement to exemplary damages and that count is therefore dismissed; (13) HHCS failed to demonstrate its entitlement to attorney fees and therefore that count is dismissed; (14) HHCS shall receive prejudgment interest from the filing of the adversary complaint until entry of judgment at the federal judgment rate; and (15) that a copy of this Memorandum be sent to the United States Attorney's Office for consideration of whether any of the bankruptcy criminal provisions found in Title 18, specifically, 11 U.S.C. § 153 and 11 U.S.C. § 157 were violated.

The court instructs counsel for HHCS to prepare an Order and Judgment not inconsistent with this Memorandum Opinion within ten (10) days of entry of this Memorandum Opinion.

It is, THEREFORE, so ordered.

### JUDGMENT

This is before the Court upon the complaints filed by the Debtor/Plaintiff Holcomb Healthcare Services, LLC ("HHCS") initiating the above consolidated Adversary Proceedings, which were tried by the Court during the week of October 25, 2004. Based upon the proof at the trial and the record in this case and for the reasons expressed by the Court in the Memorandum entered December 15, 2004, JUDGMENT is hereby granted to the Plaintiff Holcomb Healthcare Services, LLC, and it is hereby

ORDERED, that all patents, patent applications, and provisional patents claimed to be owned by any of the following and not produced to the Plaintiff by October 8, 2004, including, but not limited to, the international patent applications produced on Nov. 11, 2004 and known as WO 02/078865 Al and WO 02/079356 Al, and the Hong Kong Patent No. 1021946 for "Electromagnetic Therapeutic Treatment Device" and the corresponding Japanese Patent Application No. 9–503923 (copies of which have not been provided to date), are the property of Plaintiff, and the Defendants named below shall execute all necessary documentation to reflect assignment to and ownership in the Plaintiff:

Robert R. Holcomb
Quart Ltd.
Holcomb International, LLC
ROM Technologies, LLC
Holcomb Companies, LLC
Holcomb Scientific Creations LLC
Flavor Tech, LLC
Newawk, LLC
Fluide Electret, LLC
Green Coal, LLC
SGT Technology Holdings, LLC
Emissions Control, LLC
Holcomb Management, Inc.
Water Resources Technology, Inc.
Holcomb Investments, L.P.
Holcomb Medical Trust
Minos Investments
Holcomb Medical Research Institute
Demeter Systems LLC

Luca Enterprises Ltd.
Selene Holdings LLC
Aether Power, LLC
Holcomb Scientific, Inc.

It is further ORDERED, that HHCS's request for injunction is dismissed without prejudice to HHCS's right to renew its request in another proceeding.

It is further ORDERED, that HHCS is the rightful owner of the patents and patent applications set forth in the following chart:

| Patent No. or Patent Application No. | Title |
| --- | --- |
| 6,461,288 | Method and Apparatus for Altering the Charge Distribution Upon Living Membranes with Functional Stabilization of the Membrane Physical Electrical Integrity |
| 6,741,889 | Electronic Apparatus and Method for Treating Human Pain Through Application of an Electrical Stimulus in Combination with Application of a Magnetic Field |
| 6,703,066 | Flavor Enhancer Composition Containing Colloidal Silica and Method for Its Preparation and Use |
| 6,280,376 | Electromagnetic Therapeutic Treatment Device and Methods of Using Same |
| 6,205,356 | Electronic Apparatus and Method for Treating Human Pain Through Application of an Electrical Stimulus in Combination with Applications of a Magnetic Field |
| US 2004/0154220 Appl. No. 10/473,871 | Reducing Sulfur Dioxide Emissions from Coal Combustion |
| 5,658,573 | Method of Generating an Aqueous Suspension of Colloidal Silica |
| 5,607,667 | Body Care Compositions, Method of Using Same, and Method of Generating a Relatively Stable Aqueous Suspension of Colloidal Silica for Use Therein |
| 5,599,531 | Hair Care, Hydrating, Coloring, and Perming Compositions and Methods |
| 5,537,363 | Apparatus for Generating a Relatively Stable Aqueous Suspension of Colloidal Silica |
| 4,888,113 | Magnetic Water Treatment Device |
| US 2001/0027219 (Appl. No. 09/749,243) | Description of an Inorganic Polymer "Electret" in a Colloidal State Along with the Method of Generating and Applications |
| US 2001/0041917 (Appl. No. 09/756,474) | Placebo Apparatus for Continuous Pulse, Non–Modulated Non–Burst Mode Nerve Stimulator |
| US 2003/0092960 (Appl. No. 10/265,921) | Method and Apparatus for Altering the Charge Distribution upon Living Membranes with Functional Stabilization of the Membrane Physical Electrical Integrity |
| WO 02/079356 | Reducing Sulfur Dioxide Emissions from Coal Combustion |
| US 2004/0166246 (Appl. No. 10/473,873 | Process and Composition for Treating Wood |
| 6,776,753 | Method and Apparatus for Treating Pain with Therapeutic Magnets |
| 5,312,321 | Method and Apparatus for Suppressing Neuron Action Potential Firings |
| 6,042,531 | Electromagnetic Therapeutic Treatment Device and Methods of Using Same |

| 5,941,902 | Continuous Pulse, Non–Modulated Non–Burst Mode Nerve Stimulator and Method of Applying Same. |
|---|---|
| Not listed for protective purposes | Method of Converting Green House Gases from Fossil Fuels into Non–Toxic Base Elements |
| Unnumbered provisional patent application | Apparatus and Process for Treating Coal which is High in Sulfur Such that it Will Burn in a High Temperature Furnace with Greatly Reduced Emissions of Sulfur Dioxide ($SO_2$), Nitrous Oxide and Mercury |
| Unnumbered provisional patent application | Apparatus and Process for the Synthesis' and Application and Uses of an Inorganic Polymer Based Wood Preservative |
| WO 02/079356 | Reducing Sulfur Dioxide Emissions From Coal Combustion |
| WO 02/078865 (Appl. No. PCT/US02/10128) | Apparatus and Process for the Synthesis and Application and Uses of an Inorganic Polymer Based Wood Preservative |
| US 09/749,243 | Description of an Inorganic Polymer "Electret" in a Colloidal State Along with the Method of Generating and Apparatus |
| WO 97/49473 | Water Treatment Device and Method |
| Not listed for protective purposes | Apparatus and Process for Generating Electric Power by Utilizing High Frequency High Voltage Oscillating Current as a Carrier for High EMF CD in an Armature Board |
| Not listed for protective purposes | A Liquid Fuel with Inorganic Polymer Electret (IPE) for Enhancing Performance and Decreasing Emissions from a Combustion Engine, Heating Chamber or Jet Engine and Method of Making Same. |

This Judgment may be recorded in the United States Patent and Trademark Office and in the World Intellectual Property Organization as evidence of HHCS's ownership of the patents, provisional patents, and patent applications identified in the chart.

It is further ORDERED, that the following Defendants are indebted to HHCS in the principal amounts listed below. Additionally, pursuant to 28 U.S.C. § 1961, HHCS shall also have judgment for prejudgment interest on such principal amounts accruing from April 11, 2003 to the date of this Judgment, as set forth below:

| Defendant | Principal Amount of Judgment | Prejudgment Interest through December 26, 2004 [1] | Per diem Prejudgment Interest from December 27, 2004 through entry date of Judgment |
|---|---|---|---|
| Acu–Pain LLC | $ 4,464.04 | $ 97.52 | $ 0.16 |
| Emissions Control LLC | $ 790.00 | $ 17.26 | $ 0.03 |
| Holcomb International LLC | $ 231,691.00 | $ 5,061.25 | $ 8.11 |
| Holcomb Companies LLC | $1,890,806.13 | $41,304.32 | $66.21 |
| Holcomb Management, Inc. | $ 271,157.23 | $ 5,923.38 | $ 9.50 |

1. Calculation based on federal judgment rate of 1.27%.

| | | | |
|---|---|---|---|
| Holcomb Technologies LLC | $ 67,504.28 | $ 1,474.62 | $ 2.36 |
| Holcomb Medical Research Institute | $ 8,087.45 | $ 176.67 | $ 0.28 |
| Novatech, LP | $ 7,137.68 | $ 155.92 | $ 0.25 |
| Novatech, Inc. | $ 174,152.53 | $ 3,804.33 | $ 6.10 |
| Robert R. Holcomb | $1,134,159.26 | $24,775.51 | $39.22 |
| ROM Technologies | $ 300.00 | $ 6.55 | $ 0.01 |
| Virtual Manufacturing and Development, LLC | $ 243,038.14 | $ 5,309.13 | $ 8.51 |

It is further ORDERED, that the following Defendants are additionally indebted to HHCS in the principal amounts listed below. Additionally, pursuant to 28 U.S.C. § 1961, HHCS shall also have judgment for prejudgment interest on such principal amounts accruing from April 11, 2003 to the date of this Judgment, as set forth below:

| Defendant | Principal Amount of Judgment | Prejudgment Interest through December 26, 2004 [2] | Per diem Prejudgment Interest from December 27, 2004 through entry date of Judgment |
|---|---|---|---|
| Acu–Pain LLC | $ 4,539.04 | $ 99.16 | $ 0.16 |
| Holcomb International LLC | $ 130,446.04 | $ 2,849.57 | $ 4.57 |
| Holcomb Companies LLC | $ 613,969.58 | $13,412.06 | $ 21.50 |
| Holcomb Medical Research Institute | $ 145,915.40 | $ 3,187.50 | $ 5.11 |
| Holcomb Management, Inc. | $ 397,408.73 | $ 8,681.32 | $ 13.92 |
| Holcomb Technologies LLC | $ 37,278.76 | $ 814.35 | $ 1.31 |
| Novatech, Inc. | $ 156,491.58 | $ 3,418.53 | $ 5.48 |
| Novatech, LP | $ 5,949.89 | $ 129.97 | $ 0.21 |
| Virtual Manufacturing and Development, LLC | $ 382,617.30 | $ 8,358.21 | $ 13.40 |
| Robert R. Holcomb | $1,134,159.26 | $24,775.51 | $ 39.22 |

It is further ORDERED, that HHCS's alternative relief counts seeking substantive consolidation and/or piercing of the corporate veils of some of the corporate defendants are hereby denied.

It is further ORDERED, that HHCS's requests for attorney fees and for exemplary damages are denied.

It is further ORDERED, that a copy of the Court's Memorandum entered December 15, 2004 shall be sent to the United

2. Calculation based on federal judgment rate of 1.27%.